Nos. 25-11612 & 25-11821

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

BEAR WARRIORS UNITED, INC.,
*Plaintiff-Appellee,*

v.

SECRETARY of the
FLORIDA DEPARTMENT OF ENVIRONMENTAL PROTECTION,
*Defendant-Appellant.*

Appeal from the U.S. District Court for the
Middle District of Florida, No. 6:22-cv-2048 (Mendoza, J.)

## BRIEF OF APPELLANT

Jeffrey Brown
Department of Environmental Protection
390 Commonwealth Blvd., MS 35
Tallahassee, Florida 32399-3000
Telephone: (850) 245-2242
Jeffrey.Brown@FloridaDEP.gov

Jeffrey M. Harris
Bryan Weir
Nicholas B. Venable*
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423
jeff@consovoymccarthy.com

*Supervised by principals of the firm admitted to practice in Virginia*

*Counsel for Defendant-Appellant*

Nos. 25-11612 & 25-11821, *Bear Warriors United v. Lambert*

# CERTIFICATE OF INTERESTED PERSONS

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1 and 26.1-2, the undersigned counsel certifies that the following listed persons and parties may have an interest in the outcome of this case:

1.  Bear Warriors United, Inc. – Appellee

2.  Blackner, Lesley G. – Counsel for Appellee Bear Warriors United

3.  Blackner, Stone & Associates – Counsel for Appellee Bear Warriors United

4.  Blome, Jessica L. – Counsel for Appellee Bear Warriors United

5.  Bradford, Susann M. – Counsel for Appellee Bear Warriors United

6.  Brown, Jeffrey – Counsel for Appellant Secretary Lambert

7.  Colton, Bryan E. – Counsel for Appellee Bear Warriors United

8.  Consovoy McCarthy PLLC – Counsel for Appellant Secretary Lambert

9.  Corbari, Kelley F. – Counsel for Appellant Secretary Lambert

10. Greenfire Law, PC – Counsel for Appellee Bear Warriors United

11. Harris, Jeffrey M. – Counsel for Appellant Secretary Lambert

12. Lambert, Alexis, in her official capacity as Secretary of the Florida Department of Environmental Protection – Appellant

13. Mendoza, Honorable Carlos E. – Judge for the United States District Court for the Middle District of Florida

14. Price, Honorable Leslie H. – Magistrate Judge for the United States District Court for the Middle District of Florida

15. Rivo, Lily A. – Counsel for Appellee Bear Warriors United

16. Venable, Nicholas B. – Counsel for Appellant Secretary Lambert

Nos. 25-11612 & 25-11821, *Bear Warriors United v. Lambert*

17.  Weir, Bryan – Counsel for Appellant Secretary Lambert

Dated: July 28, 2025                    */s/ Jeffrey M. Harris*
                                   Counsel for Defendant-Appellant

# STATEMENT REGARDING ORAL ARGUMENT

Appellant respectfully requests oral argument in this appeal. This case is of exceptional importance because the district court's injunction compels the wrong agency to create new government programs and commandeers that same agency to enforce federal law. This appeal also raises important issues of standing, proximate causation, anticommandeering, and scope of remedies, for which oral argument will provide counsel the opportunity to answer any questions the Court may have.

# TABLE OF CONTENTS

Certificate of Interested Persons ....................................................................C-1

Statement Regarding Oral Argument.....................................................................i

Table of Citations...............................................................................................iii

Jurisdictional Statement.......................................................................................1

Statement of the Issues .........................................................................................1

Statement of the Case ...........................................................................................2

    A. DEP's authority under Florida law .............................................................2

    B. Alleged harm to manatees in the Indian River Lagoon..............................4

    C. The Endangered Species Act......................................................................6

    D. Procedural history .....................................................................................8

Standard of review ..............................................................................................11

Summary of Argument........................................................................................13

Argument.............................................................................................................17

    I. Plaintiff lacked standing to secure a prospective injunction................17

        A. Plaintiff lacks Article III standing generally. ....................................17

        B. Plaintiff lacks standing for the specific injunction it requested
           and received...................................................................................24

    II. DEP did not violate the ESA................................................................29

        A. Plaintiff failed to establish that DEP proximately caused any alleged
           violation of the ESA. ....................................................................29

        B. Plaintiff's expansive theory of ESA liability is contrary to the properly
           construed text of the statute. .........................................................34

    III.The district court's injunction violates Tenth Amendment
        anti-commandeering principles...........................................................37

    IV.The district court's injunction is unjustifiably broad. ...........................42

Conclusion ..........................................................................................................46

Certificate of Compliance ..................................................................................48

Certificate of Service...........................................................................................48

# TABLE OF CITATIONS

## Cases

*Aransas Project v. Shaw*, 775 F.3d 641 (5th Cir. 2014)......................15, 32, 33

*Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*,
    515 U.S. 687 (1995) ...............................15, 30, 32, 34, 35, 36

*Banks v. Sec'y, Dep't of Health & Hum. Servs.*, 38 F.4th 86 (11th Cir. 2022)............... 12, 21

*BBX Cap. v. FDIC*, 956 F.3d 1304 (11th Cir. 2020)............................................23

*Burban v. City of Neptune Beach*, 920 F.3d 1274 (11th Cir. 2019) ................................ 38, 39

*Califano v. Yamasaki*, 442 U.S. 682 (1979) ........................................................42

*City of Los Angeles v. Lyons*, 461 U.S. 95 (1983) .....................................................17

*Clark v. Coye*, 60 F.3d 600 (9th Cir. 1995) .....................................................12, 43

*FDA v. All. for Hippocratic Med.*, 602 U.S. 367 (2024).....................................17, 19

*Fla. Panthers v. Collier County*, 2016 WL 1394328 (M.D. Fla. Apr. 8, 2016) .....................29

*Fla. Pub. Int. Rsch. Grp. Citizen Lobby v. EPA*, 386 F.3d 1070 (11th Cir. 2004) .............23

*Georgia v. President of the U.S.*, 46 F.4th 1283 (11th Cir. 2022) ............................................42

*Gill v. Whitford*, 585 U.S. 48 (2018).......................................................................24

*Haaland v. Brackeen*, 599 U.S. 255 (2023) ................................................... 40, 41

*Henry v. Sheriff of Tuscaloosa Cnty.*, 135 F.4th 1271 (11th Cir. 2025) .................................12

*Holton v. City of Thomasville Sch. Dist.*, 425 F.3d 1325 (11th Cir. 2005) ......................12, 29

*In re Gee*, 941 F.3d 153 (5th Cir. 2019) .....................................................................24

*Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236 (11th Cir. 2020)........................ 25, 26, 27, 28

*Knick v. Scott*, 588 U.S. 180 (2019) ..........................................................................44

*Lewis v. Governor of Ala.*, 944 F.3d 1287 (11th Cir. 2019) ..........................................26

*Loggerhead Turtle v. Cnty. Council of Volusia Cnty.*,
    148 F.3d 1231 (11th Cir. 1998)..............................................22, 23, 28, 31, 42

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) .....................................................21

*Massachusetts v. EPA*, 549 U.S. 497 (2007) ..................................................... 23, 24

*Murphy v. NCAA*, 584 U.S. 453 (2018) ......................................................... 40, 41

*Nat'l Ass'n of Regul. Util. Comm'rs v. FERC*, 475 F.3d 1277 (D.C. Cir. 2007). ...............12

*Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967 (2005) ................36

*Peightal v. Metro. Dade County*, 940 F.2d 1394 (11th Cir. 1991) .........................................37

*Printz v. United States*, 521 U.S. 898 (1997) .........................................37

*Pullman-Standard v. Swint*, 456 U.S. 273 (1982) .........................................12

*Reno v. Condon*, 528 U.S. 141 (2000) ......................................... 16, 37, 38, 39, 41

*Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot.*, 560 U.S. 702 (2010) ...........43

*Strahan v. Coxe*, 127 F.3d 155 (1st Cir. 1997) ......................................... 44, 45

*Strahan v. Coxe*, 939 F. Supp. 963 (D. Mass. 1996) .........................................44

*Support Working Animals, Inc. v. Governor of Fla.*, 8 F.4th 1198 (11th Cir. 2021) .............25

*Thorpe v. Hous. Auth. of City of Durham*, 393 U.S. 268 (1969) .........................................37

*TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021) ......................................... 24, 29

*Travis v. Reno*, 163 F.3d 1000 (7th Cir. 1998) .........................................39

*United States v. Robertson*, 493 F.3d 1322 (11th Cir. 2007) ......................................... 12, 29

*Wooden v. Bd. of Regents of Univ. Sys. of Georgia*, 247 F.3d 1262 (11th Cir. 2001) ....... 11, 12

**Statutes**

16 U.S.C. §1421h ......................................... 5, 18

16 U.S.C. §1532 .........................................7

16 U.S.C. §1538 .........................................6

16 U.S.C. §1539 .........................................7, 25, 27

16 U.S.C. §1540 ......................................... 1, 6, 38

28 U.S.C §2201 .........................................1

28 U.S.C. §1291 .........................................1

Fla. Stat. §20.331 ......................................... 4, 27

Fla. Stat. §373.469 ......................................... 3, 20

Fla. Stat. §379.2433 ......................................... 4, 27

Fla. Stat. §403.061 ......................................... 2, 27, 28

**Constitutional Provisions**

Fla. Const. Art. 4 ......................................... 4, 27

**Regulations**

50 C.F.R. §17.3 .........................................7

Rescinding the Definition of "Harm" Under the Endangered Species Act, 90 Fed. Reg. 16102 (Apr. 16, 2025)........................................................................ 7, 35

Taking of Endangered and Threatened Marine Mammals Incidental to Commercial Fishing Operations; Commonwealth of Massachusetts, 62 Fed. Reg. 5385 (Feb. 5, 1997) ....................................................................................................................45

**Other Authorities**

Florida Fish and Wildlife Conservation Commission, *Descriptions of Manatee Death Categories* (last visited July 23, 2025) https://perma.cc/65B8-Z8AK .................... 6, 22

NOAA Fisheries, *Active and Closed Unusual Mortality Events* (last updated Mar. 27, 2025) https://perma.cc/2S86-2XUN ........................................................................................6

# JURISDICTIONAL STATEMENT

The district court had federal question jurisdiction under the Endangered Species Act (ESA), 16 U.S.C. §1540(c), (g), and the Federal Declaratory Judgment Act, 28 U.S.C §2201. R.59 at 3.[1] This Court has jurisdiction under 28 U.S.C. §1291, because the district court issued a final judgment in favor of Plaintiff following a two-day bench trial, R.172; R.173. On May 9, 2025, Defendant timely appealed that judgment. R.181. On May 19, the district court entered a permanent injunction. R.190. Defendant timely filed an amended notice of appeal specifically identifying the injunction order on May 28. R.195.

# STATEMENT OF THE ISSUES

Plaintiff, an environmental organization whose members claim to have been emotionally and financially impacted by past deaths of manatees, sued the Florida Department of Environmental Protection (DEP) under the Endangered Species Act to prevent DEP from issuing permits for septic tanks that are allegedly contributing to manatee deaths in the Indian River Lagoon. The district court granted judgment for Plaintiff and issued a sweeping injunction that requires DEP to create new manatee monitoring, feeding, and reporting programs, to apply for an incidental take permit from the federal government, and to cease issuing permits for new septic systems in the area around the Lagoon. The issues presented for appeal are:

    1.  Did Plaintiff have Article III standing to obtain its requested injunction?

---

[1] Citations to the district court docket are in the format R.X at Y. Citations to this Court's docket are in the format Doc.X at Y.

1

2. Did DEP violate the ESA?

3. Did the district court transgress the Tenth Amendment's prohibition on commandeering state officials to enforce federal law?

4. Did the district court violate important federalism interests with the scope of its injunction?

## STATEMENT OF THE CASE

### A. DEP's authority under Florida law

1. DEP is the state agency vested with the "power and the duty to control and prohibit pollution of air and water." Fla. Stat. §403.061. It has the authority under state law to "[a]pprove and promulgate current and long-range plans developed to provide for air and water quality control and pollution abatement." *Id.* §403.061(1). On July 1, 2021, the Florida Department of Health transferred to DEP responsibility for "permitting, inspection, data management, and tracking of" septic tanks. R.184-9 at 3. During the period before July 2021, when the Department of Health oversaw the septic program, that department had created standardized manuals for general operations, permitting, and septic tank regulation, as well as complaint investigation and enforcement. R.97 at 3; *see also* R.188 at 47 (DEP witness explaining that "the program is still being transferred over to DEP [and] used to be under the umbrella of Florida Department of Health").

As part of its statutory duty to regulate water pollution, DEP has adopted a basin management action plan aimed at ensuring that pollution in the North Indian River

2

Lagoon does not exceed the levels set by the State of Florida and approved by the U.S. Environmental Protection Agency under the federal Clean Water Act. R.94-5; R.184-2; R.184-6. The management plan includes DEP coordinating with and providing grants to municipal governments and other stakeholders to reduce nitrogen released by agricultural practices, stormwater, and sewage treatment plants and septic systems. R.188 at 26, 70-71; R.95-3 at 25-34. As part of that plan, stakeholders around the Lagoon were on track to reduce total nitrogen and phosphorous pollution by 55% by July 2025. R.188 at 62.

In addition to the management plan, state law requires homeowners and municipalities to make improvements designed to reduce nitrogen in the area around the Lagoon. R.188 at 26-27. As of January 1, 2024, the installation of conventional septic tanks is prohibited in locations surrounding the Lagoon. Fla. Stat. §373.469(d). Newly constructed buildings must either connect to a central sewer system (where available) or install an enhanced type of septic system that reduces nitrogen pollution by 65 percent. *Id.* By July 1, 2030, all existing conventional septic systems must connect to central sewer or upgrade to an enhanced nutrient-reducing system. *Id.* These new septic systems reduce the amount of nitrogen in the effluent liquid coming out of a septic tank, thereby mitigating the nitrogen-based harms to the Lagoon that Plaintiff alleges. R.188 at 123.

3

**2.** DEP has no authority or expertise regarding wildlife population management or restoration, which Florida law instead vests in the Florida Fish & Wildlife Conservation Commission. The Florida Constitution provides that the "[C]ommission shall exercise the regulatory and executive powers of the state with respect to wild animal life and fresh water aquatic life, and shall also exercise regulatory and executive powers of the state with respect to marine life." Fla. Const. Art. 4 § 9. The constitution further provides that the Commission "shall not be a unit of any other state agency and shall have its own staff, which includes management, research, and enforcement." *Id.*

State law has implemented this constitutional mandate, creating a number of divisions within the Commission, including the Fish and Wildlife Research Institute, which has the statutory duty to "[m]onitor the status and health of marine life, freshwater aquatic life, and wild animal life species and their habitat" and "[d]evelop restoration and management techniques for habitat and enhancement of plant and animal populations." Fla. Stat. §20.331(7)(a). The Commission is also required by law to implement and administer an enhanced manatee protection study, as part of its "mission to provide manatees with the maximum protection possible." *Id.* §379.2433(1).

## B.    Alleged harm to manatees in the Indian River Lagoon

Plaintiff is an environmental group whose members claim to be concerned about the effects of excess nutrients released by septic tanks on the manatee population in the Indian River Lagoon. R.59 at 4-7. They contend that excess nitrogen from septic tanks has caused macroalgae blooms that interfere with the amount of light available to

seagrass, which is the manatees' natural food source. *Id.* at 10-11, 17. Plaintiff alleges that seagrass levels in the Lagoon "collapse[d]" between 2011 and 2017, *id.* at 16, which was several years before DEP took over the septic tank permitting process, R.184-9 at 3.

But septic systems are far from the only source of nitrogen in the Lagoon. According to the allegations in the complaint, significant amounts of nitrogen-containing untreated sewage have also been released within the past 8 years as a result of Hurricanes Ian, Irma, and others, and from damaged sewer lines. R.96 at 6-9; R.187 at 174. In each case, DEP took appropriate enforcement action against the municipalities responsible for those releases. R.96 at 6-9.

Unexpectedly high manatee mortality rates in the Lagoon led state and federal authorities in December 2020 to declare an "unusual morality event" for Atlantic Florida manatees, defined under federal law as an "unexpected" "die-off of any marine mammal population." 16 U.S.C. §1421h(9); R.187 at 56. Florida Wildlife Commission officials concluded that these elevated manatee mortality levels ended around April 30, 2022. R.187 at 58. State and federal authorities attributed the mortality event partially to elevated nitrogen levels and a lack of available seagrass.

State officials subsequently requested that the federal Fish and Wildlife Service close the unusual mortality event, explaining that "[s]eagrass is slowly recovering in some key areas but not recovered, manatees appear to be in better physical condition

in that they are not emaciated, and reproduction is occurring with observations of mating herds and cow-calf pairs." R.184-13 at 3. In March 2025, the Fish and Wildlife Service acted on the Florida Wildlife Commission's request and closed the unusual mortality event, with an official end date of April 30, 2022. R.184-14; NOAA Fisheries, *Active and Closed Unusual Mortality Events* (last updated Mar. 27, 2025) https://perma.cc/2S86-2XUN.

Seagrass shortage is certainly not the only cause of manatee deaths. In the past 15 years there have also been two manatee unusual mortality events as a result of unusually cold winters. R.187 at 67, 80; R.93 at 31, 33-34. And human activities like boating unfortunately remain major causes of reported manatee deaths. *See* Florida Fish and Wildlife Conservation Commission, *Descriptions of Manatee Death Categories* (last visited July 23, 2025) https://perma.cc/65B8-Z8AK (describing watercraft, canal locks, poaching, and fishing equipment as other causes of manatee deaths).

## C.    The Endangered Species Act

The ESA provides that no entity subject to the jurisdiction of the United States may "take any [endangered] species within the United States." 16 U.S.C. §1538(a)(1)(B). The Act allows this provision to be enforced by the federal government as well as through citizen suits brought in district court. 16 U.S.C. §1540(g). The ESA further contains an "exception[]" from the take prohibition that authorizes the Secretary of the

Interior to issue permits for "any taking otherwise prohibited … if such taking is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity," such as construction. 16 U.S.C. §1539(a)(1)(B).

The statute defines the term "take" to mean "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. §1532(19). Federal regulations, in turn, have interpreted the word "harm" in the "take" definition to include "significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R. §17.3. The same regulations define "harass" to mean "annoying [the animal] to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering." *Id.*

In April 2025, the U.S. Fish and Wildlife Service and National Marine Fisheries Service published a proposed rule that would excise the expansive definition of "harm" under the agencies' regulations. *See* Rescinding the Definition of "Harm" Under the Endangered Species Act, 90 Fed. Reg. 16102, 16105 (Apr. 16, 2025) (to be codified at 50 C.F.R. pt. 17). The agencies have proposed to rescind this regulation because the statutory terms can be interpreted based on the single, best meaning of the statutory text. The proposed rule explains that "[t]he ESA itself defines 'take,' and further elaborating on one subcomponent of that definition—'harm'—is unnecessary in light of the comprehensive statutory definition." *Id.* at 16103.

## D.    Procedural history

On November 4, 2022, Plaintiff sued DEP under the ESA's citizen-suit provision. R.1. Plaintiff alleges that DEP violated the ESA by "taking" endangered manatees, based on the regulatory definitions of "harm" and "harass." R.59 at 27. Plaintiff has alleged only that DEP has "taken" manatees in this indirect sense, by allowing pollution that impairs seagrass levels in the Lagoon and, in turn, affects manatees. *Id.*

DEP moved to dismiss Plaintiff's operative complaint, arguing that it was immune from suit under the Tenth and Eleventh Amendments, that Plaintiff lacked standing, and that DEP was not the proximate cause of any harm to manatees. R.64.

The district court denied DEP's motion to dismiss, reasoning that Plaintiff had Article III standing because causation was satisfied by the allegations "that FDEP's ongoing failure to use its authority to regulate the sewage more efficiently continues to harm manatees." R.112 at 9. The court also found redressability because it claimed to have power to order injunctive relief, such as replacing faulty septic tanks or providing medical monitoring of manatees, that would not infringe on DEP's statutory obligation to issue permits for septic systems. *Id.* at 10. And the district court held that it could not rule on DEP's anticommandeering defense because whether this lawsuit unconstitutionally "compel[s] FDEP to comply with the ESA by regulating private individuals" would depend on the precise nature of the injunction that the Court eventually entered, which was unclear at the motion-to-dismiss stage. *Id.* at 18.

8

The parties cross-moved for summary judgment following discovery. R.91, 92. The district court concluded that a trial was necessary to establish whether there was ongoing harm or taking of manatees. R.134 at 15. It concluded that Plaintiff had presented evidence that septic systems were causing eutrophication of the Lagoon, *id.* at 10, and that DEP's regulatory scheme had allowed these discharges to occur, *id.* at 11-12. The district court also found that this effect was foreseeable because nitrogen from septic tanks can be predicted based on population growth and is not "solely" caused by natural weather events. *Id.* at 14.

After a two-day bench trial, the court held that Plaintiff was entitled to judgment and an injunction, because "legacy pollutants" in the Lagoon "have caused manatee takings in the past," and were likely to do so in the future unless DEP took affirmative steps to curtail nitrogen introduced into the Lagoon. R.172 at 12-17. At trial, a witness called by Plaintiff, Dr. Martine de Wit—the Florida Fish & Wildlife Conservation Commission doctor of veterinary medicine who leads the necropsies on manatees—conceded that manatee malnutrition was unlikely to persist because there had been "significant improvement" in manatee conditions and the manatees studied in the past two years have been in "excellent body condition." R.187 at 84, 88. But the district court deemed that testimony not "credible," opting to credit Plaintiff's expert witnesses over Dr. de Wit. R.172 at 16-17.

As part of its order on the merits, the district court invited Plaintiff to "file a proposed injunction detailing the relief it seeks." R.172 at 21. After Plaintiff filed its

proposed injunction, R.174, DEP filed a response identifying numerous problems with the relief requested. R.180. Specifically, DEP argued that the proposed injunction imposed obligations on DEP that exceeded anything required by federal law, that applying for an incidental take permit would not necessarily redress Plaintiff's injuries, that the injunction bound parties not before the court, and that DEP was not statutorily authorized to carry out manatee feeding or monitoring programs. *Id.*

On May 19, 2025, the court entered Plaintiff's proposed injunction essentially unchanged, R.190, without addressing DEP's objections. The injunction requires DEP to apply for an incidental take permit from the federal government. *Id.* It further requires that DEP create new manatee feeding, monitoring, and reporting programs out of whole cloth, and to leave those programs in place until the United States takes action on DEP's permit application (a process that could take years). *Id.* And, finally, the injunction requires DEP to stop issuing permits for new septic systems in the area around the Lagoon, *id.*, which could have severe impacts on new construction and development in that area.

DEP moved before the district court to stay the injunction pending appeal. R.191. The district court denied the motion, reaffirming its previous holdings on standing, proximate causation, and anti-commandeering. R.201. As part of that ruling, the district court held that private parties were not violating the ESA by operating conventional septic tanks that release nitrogen because their actions did not foreseeably cause the taking of an endangered species, but that DEP nevertheless could still be held to

10

have foreseeably violated the ESA by inadequately regulating private property owners at another level of remove. *Id.* at 10, 12.

DEP subsequently moved for a stay pending appeal in this Court, which denied the motion over a dissent by Judge Grant. Doc.16. The majority concluded that DEP had not established a substantial likelihood of success on the merits on its standing, proximate cause, or anticommandeering arguments. *Id.* at 3. But it reserved the question of whether the scope of the district court's injunction might exceed the district court's equitable power or violate federalism principles. *Id.* at 5.

Judge Grant dissented from the order denying the stay, criticizing both the scope of the injunction and the district court's decision on the merits. She emphasized that the order required DEP "to establish from whole cloth (and in a matter of days) a program for assessing, feeding, and monitoring manatees and their habitat—a task that agency has neither the expertise nor the authority to complete." *Id.* at 7 (Grant, J., dissenting). And, on the merits, she explained that the district court issued the sweeping injunction "for plaintiffs whose standing is uncertain, whose claims of foreseeability and proximate cause are suspect, and whose proposed remedy very likely makes demands of the Department that are not sustainable under the Tenth Amendment's anticommandeering principle." *Id.*

## STANDARD OF REVIEW

This Court reviews questions of Article III standing de novo. *Wooden v. Bd. of Regents of Univ. Sys. of Georgia*, 247 F.3d 1262, 1271 n.9 (11th Cir. 2001). A plaintiff bears

the burden of showing that it has Article III standing for each type of relief it seeks. *Banks v. Sec'y, Dep't of Health & Hum. Servs.*, 38 F.4th 86, 93 (11th Cir. 2022). "While it certainly is true that this Court generally reviews a district court's underlying factual findings only for clear error, a district court's ultimate resolution of a legal question such as standing is always reviewed de novo." *Wooden*, 247 F.3d at 1271 n.9.

This Court reviews a finding of proximate causation for clear error. *United States v. Robertson*, 493 F.3d 1322, 1334 (11th Cir. 2007). A district court clearly errs where its finding "'is based on an erroneous view of the law.'" *Holton v. City of Thomasville Sch. Dist.*, 425 F.3d 1325, 1350 (11th Cir. 2005). In other words, "if a district court's findings rest on an erroneous view of the law, they may be set aside on that basis." *Pullman-Standard v. Swint*, 456 U.S. 273, 287 (1982).

Whether the district court's injunction unconstitutionally commandeers a state agency is a "question of law" subject to de novo review. *Nat'l Ass'n of Regul. Util. Comm'rs v. FERC*, 475 F.3d 1277, 1283 (D.C. Cir. 2007).

Finally, this Court reviews "both a district court's decision to grant an injunction, as well as the scope of that injunction, for abuse of discretion." *Henry v. Sheriff of Tusca-loosa Cnty.*, 135 F.4th 1271, 1285 (11th Cir. 2025). Due to federalism concerns, a district court will be deemed to have committed an abuse of discretion "if its injunction requires any more of state officers than demanded by federal constitutional or statutory law." *Clark v. Coye*, 60 F.3d 600, 604 (9th Cir. 1995).

# SUMMARY OF ARGUMENT

The judgment and permanent injunction suffer from pervasive flaws on jurisdiction, the merits, and the scope of injunctive relief, and should be reversed for several independent reasons.

I.    The district court erred in concluding that Plaintiff had Article III standing because Plaintiff failed to establish injury-in-fact, causation, or redressability. To obtain a prospective injunction, Plaintiff needed to show that it was likely to be injured in the future in a similar way. Here, Plaintiff's members claimed to have been injured by seeing dead manatees or losing business because of declining manatee populations. But the manatee unusual mortality event ended in 2022, and it had been years since any manatee death had been linked to emaciation. Those undisputed improvements in conditions and manatee health (which have been recognized by both federal and state officials) make future injury insufficiently likely to justify a sweeping prospective injunction.

Plaintiff also failed to establish the requisite causal link between its alleged injuries and DEP's actions. Plaintiff's theory of causation turns on a lengthy, convoluted, and speculative chain of events in which DEP issues permits for septic tanks, the tanks are installed and used by third parties, those septic tanks release excessive pollutants into the Lagoon, the pollutants combine with preexisting legacy pollutants to harm manatees' food sources, the manatees are injured or killed from emaciation, and Plaintiff's members then see the injured manatees and face injury to their recreational or

13

business interests. This chain of causation far exceeds that of other ESA cases in which plaintiffs were found to have standing.

Redressability is also lacking here. Even if all conditions of the injunction are satisfied, Plaintiff's members may continue to encounter manatees that died or were injured by countless other independent causes. Indeed, if DEP obtains a federal incidental take permit as required by the injunction, this would *authorize* the takes of manatees in the same manner as described in Plaintiff's complaint. And the injunction additionally requires DEP to create and implement brand-new manatee feeding and monitoring programs. But DEP has no authority under state law to implement programs like these; that authority is vested in a different agency, the Fish & Wildlife Conservation Commission, which is not a party to this case. Further, the Florida Fish & Wildlife Commission would need additional authorizations from the United States Fish & Wildlife Service to carry out these requirements. All of this defeats redressability under binding circuit precedent.

II.    The district court further erred in concluding that DEP violated the ESA. The ESA's proximate causation requirement functions to block the application of its harsh liability provisions in cases like this one with an attenuated causal link between the defendant's action and the taking of the endangered species. It strains causation beyond its breaking point to suggest DEP's permitting regime foreseeably caused manatee takings, as DEP's permitting decisions were "indirect and far removed from committing acts with knowledge that a habitat will be adversely affected and the species

14

killed." *Aransas Project v. Shaw*, 775 F.3d 641, 659 n.12 (5th Cir. 2014). Indeed, Plaintiff's allegations of causation here are even more tenuous than a fact pattern that Justice O'Connor emphasized would *not* be sufficient to show proximate causation: when erosion from farm activities introduces silt into a river that has downstream effects on a protected species. *See Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687, 713 (1995) (O'Connor, J., concurring).

Plaintiff's more tenuous theory depends upon multiple actions by multiple third parties that a state government does not control—*i.e.*, homeowners who may fail to maintain their individual septic systems, and local government laws that allow for development. And Plaintiff's causation theory further depends on the assumption that these third-party actions will cause the next "domino" to fall—*i.e.*, mass algae production—which will, in turn, cause the next domino to fall—*i.e.*, mass seagrass reduction—which will, in turn, cause the next domino to fall—*i.e.*, manatee starvation or habitat reduction.

Plaintiff's ESA claim thus fails on the merits under existing law. But the U.S. Fish and Wildlife Service has also proposed changes to its regulations that would eviscerate Plaintiff's entire theory of the case. Those proposed regulations would delete an expansive definition of "harm" that sweeps beyond intentional harm to protected species and instead encompasses indirect effects on habitats. If finalized, those regulations would foreclose Plaintiff's entire theory of ESA liability, and this Court would be bound to apply this change in law as long as the case remains on direct appeal.

**III.** The permanent injunction unconstitutionally commandeers DEP officials to implement the ESA against individual polluters, in violation of the Tenth Amendment. The individual septic tank owners who are actually introducing pollutants into the Lagoon are not parties to this case. Instead, the permanent injunction compels DEP to implement the ESA against those third parties by commandeering DEP's permitting authority and prohibiting any issuance of new septic permits. This injunction unconstitutionally requires DEP "in [its] sovereign capacity to regulate [its] own citizens" and "require[s] state officials to assist in the enforcement of federal statutes regulating private individuals." *Reno v. Condon*, 528 U.S. 141, 151 (2000). Simply put, Plaintiff cannot seek to implement the ESA against private polluters using unconstitutional means, even if those means might be more effective than individual lawsuits.

**IV.** Finally, even assuming jurisdiction and liability, the permanent injunction is grossly overbroad and violates important federalism interests by imposing onerous conditions beyond what is necessary to ensure compliance with the ESA. If DEP is violating the ESA by taking manatees, then obtaining an incidental take permit would cure any violation by explicitly authorizing those takes. But the permanent injunction extends far beyond that by requiring the creation of feeding and monitoring programs from whole cloth, as well as an extraordinary moratorium on new septic permits. Even if some limited relief were warranted, this injunction is significantly overbroad and implicates serious federalism and takings concerns.

16

# ARGUMENT

## I.    Plaintiff lacked standing to secure a prospective injunction.

To establish standing, "a plaintiff must demonstrate (i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024). Further, "[i]n exercising their equitable powers federal courts must recognize '[t]he special delicacy of the adjustment to be preserved between federal equitable power and State administration of its own law.'" *City of Los Angeles v. Lyons*, 461 U.S. 95, 112 (1983). Plaintiff has not established Article III standing either as a general matter or for the specific injunction it obtained, and the district court erred by concluding otherwise.

### A.    Plaintiff lacks Article III standing generally.

The district court's holding on Article III standing should be reversed for several independent reasons. First, Plaintiff has not shown sufficient likelihood of future injury. The injury-in-fact requirement demands that "the injury must be actual or imminent, not speculative—meaning that the injury must have already occurred or be likely to occur soon." *All. for Hippocratic Med.*, 602 U.S. at 381. And a plaintiff seeking a prospective injunction must show "a sufficient likelihood that he will again be wronged in a similar way." *Lyons*, 461 U.S. at 111.

17

The district court concluded that the injury-in-fact requirement was satisfied by Plaintiff's members who claim to have seen dead manatees or lost business from declining manatee populations. R.172 at 7-8. The court concluded that "Plaintiff's members are like[ly] to encounter dead manatees again" and noted that Plaintiff's expert had seen a dead manatee calf in the months before trial. *Id.* at 8 & n.4.[2]

Those facts do not establish a sufficient likelihood of future injury. Plaintiff's expert could not establish that the manatee calf he saw died because of any cause traceable to *DEP's* actions or omissions, as opposed to natural or unrelated causes. This case has focused on a manatee unusual morality event, defined under federal law as an "unexpected" "die-off of any marine mammal population." 16 U.S.C. §1421h(9). But the district court acknowledged that the unusual mortality event in the Indian River Lagoon has ended and that "the last necropsy that showed manatee emaciation occurred two years ago." R.172 at 19. The court nonetheless downplayed the importance of these facts for purposes of the merits of Plaintiff's ESA claim because the death "'even of a single'" member of an endangered species constitutes a taking. *Id.* But the end of the unusual mortality event and the absence of any proven manatee deaths from emaciation in the last two years are clearly relevant to Article III standing—*i.e.*, the likelihood that Plaintiff's members will be injured in a similar way in the future.

---

[2] At trial, the district court sustained DEP's objection to plaintiff's attempt to admit a photo of this dead calf, noting that it was "fact witness testimony offered from an expert who wasn't submitted as a fact witness." R.187 at 223.

Second, Plaintiff has not established that its speculative future injuries would be caused by DEP. "[P]laintiffs attempting to show causation generally cannot 'rely on speculation about the unfettered choices made by independent actors not before the courts.'" *All. for Hippocratic Med.*, 602 U.S. at 383. Further, "[t]he causation requirement also rules out attenuated links—that is, where the government action is so far removed from its distant (even if predictable) ripple effects that the plaintiffs cannot establish Article III standing." *Id.*

The district court's finding of present harm to Plaintiff's members rested on "legacy pollutants" in the Indian River Lagoon that "have caused manatee takings in the past." R.172 at 12-13. But DEP did not regulate septic tank permits before 2021, R.184-9 at 3., and this regulatory handover occurred *after* the December 2020 start of the manatee unusual mortality event that has been a focus of this litigation, R.187 at 56.

Thus, even under the district court's own reasoning, Plaintiff's alleged injuries were caused by independent actions of third parties not before the court. The district court concluded that the existence of "legacy pollutants" meant that "FDEP would have to reduce nutrients entering the [Lagoon] to a low enough level and for a long enough time for nutrients to cycle out of the system to allow seagrasses to return at significant levels." R.172 at 17. And the district court credited testimony that "even if *all nutrients* ceased to enter the [Lagoon], seagrasses would only return after at least a decade." *Id.* at 16. In other words, the injunction requires DEP to prohibit all new septic tank permits in the area around the Lagoon (*i.e.*, halt new development) to remedy

19

harms previously caused by third parties not before the court, where DEP did not even have statutory authority to regulate those activities before 2021.

Plaintiff and the district court also downplayed the fact that state law already mandates a number of requirements, independent from this litigation, designed to reduce nitrogen in the Lagoon. As of January 1, 2024, the installation of conventional septic tanks is prohibited in the area surrounding the Lagoon. Fla. Stat. §373.469(d). And, by July 1, 2030, all existing conventional septic systems must connect to a central sewer if available or upgrade to an enhanced nutrient reducing system or other wastewater system that achieves 65 percent reduction in nitrogen. *Id.* Plaintiff's expert opined that while DEP had "achieved their 2025 milestone," he thought that "these loads are not being reduced quick[ly] enough to meet the department's goals for 2030" because there are "cities that have excess stormwater nutrients coming out or too many homes on septic tanks that need to be mitigated." R.187 at 168-69. In other words, Plaintiff's own expert attributed the difficulty of meeting nitrogen reduction targets to *existing* stormwater discharges, wastewater treatment, and septic systems, which this lawsuit and the district court's injunction do not even address.

The causation requirement also is not satisfied here because of the highly attenuated and speculative link between DEP's actions and any harm to manatees (and, in turn, Plaintiff's members). To find cognizable Article III causation here would require a convoluted connection between (1) DEP issuing a septic tank permit, (2) local au-

thorities approving the construction, (3) the property owner completing the construction, (4) tank location and ground water conditions causing the septic tank runoff to flow into the Lagoon, (5) the nitrogen causing an algae bloom, (6) manatees being harmed because that algae prevents the growth of seagrass and becomes too much of a component of their diet, (7) those manatees dying because of their altered diet, and (8) Plaintiff's members encountering those dead manatees or changing their business practices as a result of manatee deaths. This is precisely the type of case in which this Court has warned there are "'far too many steps'" between the defendant's actions and the plaintiff's injuries, and this "'highly attenuated chain of possibilities'" is not sufficient to establish standing. *Banks*, 38 F.4th at 97.

Third, Plaintiff cannot satisfy the redressability requirement for Article III standing. Redressability requires a demonstration that it is likely, not merely speculative, that an injury will be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Plaintiff cannot show the relief it requested is likely to prevent future harm to its members. Given the extent of "legacy pollutants" the court found to exist in the Lagoon, R.172 at 16, it is highly speculative to conclude that the terms of the permanent injunction (such as prohibiting the issuance of new septic permits or forcing DEP to apply for an incidental take permit) would prevent any of Plaintiff's members from encountering another dead manatee or having their businesses impacted by a decline in manatee population.

Indeed, malnutrition due to eutrophication is hardly the only cause of manatee deaths, so Plaintiff's members may have previously encountered (or will encounter in the future) manatees that died from unrelated causes. *See* Florida Fish and Wildlife Conservation Commission, *Descriptions of Manatee Death Categories* (last visited July 23, 2025) https://perma.cc/65B8-Z8AK (describing watercraft, canal locks, poaching, and fishing equipment as other causes of manatee deaths). In fact, there have been two unusual mortality events for manatees in the past 15 years that were caused by unusually cold winters and involved a significant number of manatee deaths. R.93 at 31, 33-34; *supra* at 6.

In support of its finding of Article III standing, the district court cited *Loggerhead Turtle*, where this Court concluded that sea turtles had standing (in their own right) to sue a county government under the ESA.[3] But that case is readily distinguishable. The defendant in *Loggerhead Turtle* was "a regulatory entity that exerts control over the use of something that allegedly takes protected wildlife." *Loggerhead Turtle v. Cnty. Council of Volusia Cnty.*, 148 F.3d 1231, 1251 (11th Cir. 1998). There, the County was responsible for "allowing landowners to use lights all day and all night" on the beachfront, which in turn directly led to the deaths of hatchling turtles that were drawn toward the lights

---

[3] The notion that an animal species can sue in its own right was drawn from Ninth Circuit precedent and is questionable in light of modern standing doctrine, but *Loggerhead Turtle* is distinguishable in all events.

and away from the ocean. *Id.* at 1235, 1251. That is, the beachfront lighting itself had an immediate effect on the turtles and caused immediate harm to them.

Here, by contrast, DEP had no control over the majority of "legacy pollutants" the court found caused Plaintiff's injury, and has no authority to implement the wildlife wellness programs required by the injunction, *see infra* at 25-29. This Court has recognized in cases otherwise similar to *Loggerhead Turtle* that Article III standing is not present where the defendant lacks "'absolute authority to issue environmental ordinances that would ... prevent plaintiffs' injuries.'" *BBX Cap. v. FDIC*, 956 F.3d 1304, 1313 (11th Cir. 2020). DEP lacks that kind of absolute power here, since its ability to address nitrogen levels in the Lagoon are significantly hindered by the legacy pollutants that the district court concluded are driving the (since-concluded) threat to manatee health.

Like the district court, the motions panel of this Court examined the standing issue at too high a level of generality, simply noting that cases like *Loggerhead Turtle* had concluded organizations had standing to sue "inadequate regulators." Doc.16 at 3. But in *Loggerhead Turtle*, the County's authorization of nighttime beach lights had a much more direct connection to the turtle takings, since the artificial light directly caused turtle deaths, 148 F.3d at 1235.

The other cases the motions panel cited, *Fla. Pub. Int. Rsch. Grp. Citizen Lobby v. EPA*, 386 F.3d 1070, 1083–85 (11th Cir. 2004); *Massachusetts v. EPA*, 549 U.S. 497, 523–25 (2007), are even more general, standing only for the proposition that harm to "the aesthetic, recreational, and economic interests of members of the organization" can

23

establish injury-in-fact, Doc.16 at 3. The Court in *Massachusetts v. EPA* also downplayed any causation concerns by noting that just the emissions at issue in the case would make the United States "the third-largest emitter of carbon dioxide in the world." *Massachusetts*, 549 U.S. at 524. None of the cited cases addressed whether a causal chain as convoluted and attenuated as the one involved in this case can give rise to Article III standing. Serious deficiencies regarding multiple requirements for Article III standing make Plaintiff's standing in this case "uncertain" at best. Doc.16 at 7 (Grant, J., dissenting).

### B.     Plaintiff lacks standing for the specific injunction it requested and received.

In addition to lacking Article III standing generally, Plaintiff lacks standing for several of the specific provisions of the district court's injunction. A showing of standing for each provision of the injunction is necessary because "standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). In other words, "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury" in a way that is consistent with the Constitution. *Gill v. Whitford*, 585 U.S. 48, 73 (2018). This same principle means that Plaintiff may not "identify one injury and then bootstrap it to complain about others." *In re Gee*, 941 F.3d 153, 160 (5th Cir. 2019). Both the requirement that DEP apply for an incidental take permit and the requirement that it develop and implement new manatee feeding and monitoring programs fail the causation and redressability requirements.

24

The injunction's requirement that DEP apply for an incidental take permit, R.190 ¶ 1, will not redress Plaintiff's injury for two independent reasons. First, these permits are discretionary, and there is no guarantee the U.S. Fish & Wildlife Service would grant DEP's application. *See* 16 U.S.C. §1539(a)(1) (USFWS "may" grant a permit). Second, even if the permit were granted, DEP would be free to continue the very incidental taking that Plaintiff alleges is the source of its injury. *See* R.59 at 31 (complaining that "DEP has 'incidentally taken' manatees in the North IRL within the meaning of the ESA"). In other words, applying for and receiving a permit would provide *explicit federal authorization* to continue the very conduct that Plaintiff complains of. That authorization may come with conditions designed to mitigate any harm to manatees, but this does not change the basic reality that issuance of a permit would authorize takes of manatees. This is the opposite of redressability.

Moreover, several of the injunction's specific requirements direct DEP to perform activities outside its statutory authority. This Court has made clear that suing the wrong defendant creates insurmountable causation and redressability problems. *See Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1253 (11th Cir. 2020). "[W]here, as here, a plaintiff has sued to enjoin a government official from enforcing a law, he must show, at the very least, that the official has the authority to enforce the particular provision that he has challenged, such that an injunction prohibiting enforcement would be effectual." *Support Working Animals, Inc. v. Governor of Fla.*, 8 F.4th 1198, 1201 (11th Cir. 2021).

25

In *Jacobson*, the plaintiffs' injuries regarding ballot format were not "traceable to the Secretary [of State]—the only defendant in this action" because the officials responsible for ballot order were "independent officials under Florida law who are not subject to the Secretary's control." 974 F.3d at 1253. The lawsuit thus could not "provide redress" because "[i]f a plaintiff sues the wrong defendant, an order enjoining the correct official who has not been joined as a defendant cannot suddenly make the plaintiff's injury redressable." *Id.* at 1254-55. This is because, for the redressability prong, "'it must be *the effect of the court's judgment on the defendant*'—not an absent third party—'that redresses the plaintiff's injury, whether directly or indirectly.'" *Lewis v. Governor of Ala.*, 944 F.3d 1287, 1301 (11th Cir. 2019) (en banc).

Simply put, injunctive relief must be addressed to state officials who have the power to implement the injunction. If the defendant cannot effectuate the plaintiff's proposed remedy, then the plaintiff's injury is neither traceable to, nor redressable by, the defendant for purposes of Article III standing. *Jacobson*, 974 F.3d at 1253-56.

Here, the injunction's requirements that DEP "establish and implement a biomedical assessment program for manatees," "establish a supplemental feeding program for manatees," and "submit quarterly reports … documenting mortality statistics for both adults and neonatal manatees, as well as live manatee recoveries," R.190 ¶¶ 2-4, are directed at an agency without statutory authority to implement them. Under state law, DEP is not responsible for, has no authority to, and lacks the necessary expertise to monitor or provide care for marine mammal populations. Its authority is limited to

26

managing air and water "pollution." Fla. Stat. § 403.061. The injunction, in short, mandates "a task that [DEP] has neither the expertise nor the authority to complete." Doc.16 at 7 (Grant, J., dissenting).[4]

Instead, the Florida Constitution vests the authority over "management, protection, and conservation" of marine mammal life in the Florida Fish & Wildlife Conservation Commission. Fla. Const. Art. 4 §9. Florida statutes further specify that ensuring the stability of manatee populations is the Commission's responsibility. *See, e.g.*, Fla. Stat. §20.331(7)(a) (the Commission shall "[m]onitor the status and health of marine life" and "[d]evelop restoration and management techniques"); §379.2433.

The Commission, in other words, is the agency with authority under state law to carry out any remedial programs with respect to manatees (even assuming the finding of liability and injunction were appropriate in the first place). It is an "independent" body "not subject to [DEP's] control." *Jacobson*, 974 F.3d at 1253. But Plaintiff chose to sue DEP, not the Commission. And "[a]ny persuasive effect a judicial order might

---

[4] Moreover, the feeding and monitoring activities required by the injunction would *themselves* be considered a form of "taking" which means that DEP cannot implement those programs or otherwise interfere with the manatees without first applying for a permit from the federal Fish and Wildlife Service. 16 U.S.C. §1539(a)(1)(A). Therefore, DEP must apply for one of these permits to even begin to implement the district court's injunction, which it has done. R.206 at 2. The fact that DEP requires further federal permission to implement the remedies in the permanent injunction further underscores the tenuous connection between DEP's authority and the relief ordered below.

27

have upon [other agencies], as absent nonparties who are not under the [DEP's] control, cannot suffice to establish redressability." *Id.* at 1254.

In its stay order, the district court responded to this general point with a new theory: that DEP may simply instruct the Commission to comply through an inter-agency agreement. R.201 at 8 (citing Fla. Stat. §403.061(4)). That is, the district court now contemplates that DEP—which has zero state-law authority to feed or monitor manatees—must launch a contracting process with a non-party state agency to comply with the injunction. But the district court overread DEP's contracting power under Florida law, which requires other agencies to make contracted services available only "for this purpose:" "to control and prohibit pollution of air and water." Fla. Stat. §403.061. The Wildlife Commission has no state-law obligation to provide services to DEP for the feeding and monitoring of manatee populations. Far from justifying the injunction, the statute belatedly cited by the district court only underscores the highly attenuated link between *DEP's* actions and the remedy for Plaintiff's alleged injuries.

The motions panel of this Court suggested that Plaintiff may have "had standing based on other, permissible remedies," citing *Loggerhead Turtles* for the proposition that "for standing, 'we need only find constitutional at least one available remedy that would adequately bring about … compliance with the' Act." Doc.16 at 5 (quoting 148 F.3d at 1254). But relying on *Loggerhead Turtle* to decide this point was misplaced because *Loggerhead Turtle* was decided in the motion to dismiss posture, 148 F.3d at 1236. While

28

pointing to a single constitutional remedy may be sufficient to survive a motion to dismiss, it does not suffice to establish standing for a series of extraordinary remedies granted at the end of a trial in a permanent injunction order. DEP respectfully requests that this Court examine standing for each specific remedy that the district court granted, to prevent standing from being "dispensed in gross." *TransUnion*, 594 U.S. at 431.

## II.    DEP did not violate the ESA.

### A.    Plaintiff failed to establish that DEP proximately caused any alleged violation of the ESA.

Reversal is independently warranted because Plaintiff did not demonstrate that DEP proximately caused individual septic tank owners to violate the ESA. While this Court reviews a finding of proximate cause for clear error, *Robertson*, 493 F.3d at 1334, a district court clearly errs where its finding "'is based on an erroneous view of the law.'" *Holton*, 425 F.3d at 1350. The district court erred because it reached legally incompatible conclusions about DEP's liability under the ESA and failed to account for the extent to which the highly attenuated causal chain in this case made any harm to manatees foreseeable.

"In order for regulatory acts to result in ESA liability, there must be a *close connection* between *the liable actor's conduct* and habitat destruction or killing of endangered species." *Fla. Panthers v. Collier County*, 2016 WL 1394328, at *22 (M.D. Fla. Apr. 8, 2016) (emphasis added). Here, the causal connection between DEP's permitting and the current taking of any manatees is quite attenuated, as it depends on "legacy pollutants"—

29

much of which was permitted by a different agency years earlier—creating conditions in the Lagoon that, along with other independent, unrelated factors, impaired the ability of seagrasses to grow and, in turn, affected manatees' diets. R.172 at 12.

In finding proximate causation under the ESA, the district court cited Justice O'Connor's concurrence in *Sweet Home*. There, Justice O'Connor gave the example that a farmer who drained a pond on his property would be the proximate cause of the taking of any endangered fish that died as a result. *Sweet Home*, 515 U.S. at 713 (O'Connor, J., concurring). The district court invoked that analogy here—DEP purportedly violating the ESA by harming the manatees' habitat. R.172 at 18; R.134 at 15.

But the far more apt example from Justice O'Connor's concurrence is one she provided to show when proximate cause under the ESA would *not* be satisfied: where "'a farmer who tills his field and causes erosion that makes silt run into a nearby river which depletes oxygen and thereby [injures] protected fish.'" *Sweet Home*, 515 U.S. at 713. That example of non-causation is far more analogous to the attenuated chain of causation Plaintiff alleges here. *See* R.59 at 15 (describing the following causal chain: "1) nitrogen in human wastewater leaches, and in some cases, is directly introduced as raw sewage, into the North IRL from septic tanks and wastewater plants, 2) thereby causing nitrogen enrichment of the Lagoon, 3) which in turn causes harmful algae blooms, 4) which in turn destroy water quality and block sunlight from reaching seagrass, thereby destroying seagrass").

In its order denying DEP's motion for a stay of the injunction, the district court conceded that this example demonstrates that individual property owners are not foreseeably violating the ESA, concluding that "proximate causation does not attach" to "private parties operating septic tanks." R.201 at 11-12. Yet the court nonetheless reaffirmed its prior conclusions on proximate causation, concluding that "FDEP's role is not so attenuated." *Id.* at 12. In other words, the district court concluded that private polluters whose septic tanks may actually introduce pollutants into the Lagoon *are not* foreseeably violating the ESA, but DEP *is* because it is overseeing the permitting process at a higher level of remove.

That reasoning is directly contrary to Plaintiff's "indirect" theory of ESA liability, under which DEP's liability is derivative of the takings of individual polluters. *See* R.59 at 28 ("DEP is violating the ESA by effectively authorizing third parties to operate septic tanks and wastewater plants that discharge nitrogen into the North IRL, which takes manatees by harassing, harming, and killing them."). Under that derivative liability theory, the plaintiff sues "a 'governmental third party pursuant to whose authority an actor directly exacts a taking of an endangered species.'" *Loggerhead Turtle*, 148 F.3d at 1253. *Loggerhead Turtle* concluded that "under *Sweet Home*, Volusia County need not operate every beachfront lighting source itself to be held liable under the ESA. Rather, its indirect control over lighting is sufficient." *Id.* at 1250-51. But this theory of liability falls apart if the individual septic tank owners did not foreseeably violate the ESA. If, as the district court concluded, the actions of individual septic tank owners are too

31

attenuated from any taking of manatees, then DEP's actions must necessarily be too attenuated as well.

In addition to misconstruing the legal theory of indirect, derivative liability under the ESA, the district court further erred in concluding that any harm to manatees was foreseeable. Indeed, the principal focus of Justice O'Connor's concurrence in *Sweet Home* was on how proximate-causation principles must be applied carefully to "alleviate" the harsh results of applying the ESA's stringent liability provisions to indirect takes of endangered species. 515 U.S. at 709, 713. DEP's activities are even more attenuated than Justice O'Connor's example of the farmer whose tilling causes erosion that indirectly affects endangered fish. 515 U.S. at 713. DEP issues permits for structures built by third parties that may release pollutants to groundwater, which may then travel underground to the Lagoon, which may then contribute to the growth of algae, which could shade seagrasses, which could limit the growth of the seagrasses, and thereby purportedly harm a food source for manatees.

It strains causation beyond its breaking point to suggest that DEP's permitting regime foreseeably caused manatee takings. In a similar case involving licensing use of state water that allegedly damaged a whooping crane habitat, the Fifth Circuit concluded "licensing is, in this case, indirect and far removed from committing acts with knowledge that a habitat will be adversely affected and the species killed." *Aransas Project*, 775 F.3d at 659 n.12. The Fifth Circuit concluded the habitat harm was not fore-

seeable because it depended on "[c]ontingencies concerning permittees' and others' water use, the forces of nature, and the availability of particular foods to whooping cranes." *Id.* at 662.

Just as in that case, the foreseeability requirement is not met here as a matter of law because of factors including "remoteness, attenuation, or the natural and probable consequences of actions." *Id.* at 658. Nitrogen levels in the Lagoon are influenced by a number of factors in addition to septic tanks, including natural disasters like hurricanes, stormwater discharges, agricultural discharges, and damage to sewer mains. R.96 at 6-9; R.187 at 174; R.95-3 at 25-34.

In the district court's summary judgment order, the court distinguished *Aransas Project* on the ground that it involved "extraordinary conditions" while here "eutrophication from septic tank systems and wastewater treatment plant discharges can be predicted as a function of population growth and is not solely caused by natural weather events." R.134 at 14. But that reasoning misses key facts from both cases. *Aransas Project* involved private parties withdrawing water from rivers that led to "a significant reduction in freshwater inflow" which, combined with a drought, allegedly harmed the whooping crane habitat. 775 F.3d at 646-47.

This case similarly involved "extraordinary conditions" that contributed to eutrophication, such as Hurricanes Irma and Ian, as well as unauthorized discharges from municipal waste treatment facilities. R.96 at 6-9. DEP took enforcement action to pe-

nalize the responsible parties for those discharges, but they nonetheless released nitrogen into the Lagoon that contributed to eutrophication. *Id.* And, while the district court found that a healthy lagoon could recover from sea-grass loss due to hurricanes, R.134 at 10, that does not change the fact that both man-made and extraordinary natural causes contributed to seagrass loss in this case, just as both types of causes contributed to drought conditions in *Aransas Project* in unforeseeable ways.

DEP respectfully requests that this Court reverse the district court's holding as to proximate cause because it was premised on a misunderstanding of the nature of derivative liability under the ESA and because the foreseeability requirement was not met here as a matter of law.

### B. Plaintiff's expansive theory of ESA liability is contrary to the properly construed text of the statute.

Plaintiff's entire case relies on federal regulations that expand the statutory definition of "take" under the ESA to include "an act which causes significant habitat modification or degradation which kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." R.59 at 8-9, 27 (citing 50 C.F.R. §17.3). Thirty years ago, the Supreme Court upheld this regulation under the *Chevron* framework, holding that "[w]hen Congress has entrusted the Secretary with broad discretion, we are especially reluctant to substitute our views of wise policy for his." *Sweet Home*, 515 U.S. at 690, 708 (citing *Chevron v. Nat. Res. Def. Council*, 467 U.S. 837 (1984)).

34

Earlier this year, the U.S. Fish and Wildlife Service and National Marine Fisheries Service published a proposed rule that would excise that expansive definition of "harm" under the ESA. *See* Rescinding the Definition of "Harm" Under the Endangered Species Act, 90 Fed. Reg. 16102, 16105 (Apr. 16, 2025) (to be codified at 50 C.F.R. pt. 17). The proposed regulation instead rests only on the definition of "take," which "require[s] an 'affirmative act directed immediately and intentionally against a particular animal—not an act or omission that indirectly or accidentally causes injury to a population of animals.'" *Id.* at 16103 (cleaned up).

As an initial matter, the proposed rule provides the best reading of the statute, under which DEP cannot be found liable. The statutory term "take" has a clear, ordinary meaning: "To 'take,' when applied to wild animals, means to reduce those animals, by killing or capturing, to human control." *Sweet Home*, 515 U.S. at 717 (Scalia, J. dissenting) (collecting sources). In other words, "take" "describes a class of acts (not omissions) done directly and intentionally (not indirectly and by accident) to particular animals (not populations of animals)." *Id.* at 718. The proposed regulation correctly recognizes this as the best reading of the statute, concluding that the prior "regulations' interpretation of the statutory language violates the *noscitur a sociis* canon, did not properly account for over a thousand years of history, and is inconsistent with the structure of the ESA." 90 Fed. Reg. at 16103.

Here, Plaintiff has never contended that DEP is intentionally killing manatees; it has instead rested its case on the notion that DEP indirectly or accidentally causes injury

35

to manatees via impacts on their habitat or food sources. Plaintiff's entire theory of the case—and the sweeping injunction entered based on a finding that DEP violated that theory of ESA liability—would be a non-starter under the interpretation set forth in the proposed rule.

The pending rule raises the possibility that the regulation under which Plaintiff has proceeded (and the decision in *Sweet Home* upholding that regulation) may soon no longer be good law. Even under the now-repudiated *Chevron* framework, a judicial precedent cannot "foreclose an agency from interpreting an ambiguous statute" unless that precedent holds that "the statute unambiguously forecloses the agency's interpretation." *Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982-83 (2005). "Instead, the agency may, consistent with the court's holding, choose a different construction, since the agency remains the authoritative interpreter (within the limits of reason) of such statutes." *Id.* at 983.

*Sweet Home* did not reach an unambiguous interpretation of the ESA that would prevent the agency from changing its interpretation now. Instead, the Court merely found ambiguity and deferred to the agency, holding that "Congress did not unambiguously manifest its intent to adopt respondents' view and that the Secretary's interpretation is reasonable suffice to decide this case." 515 U.S. at 703. Nothing in *Sweet Home* prevents the federal government from finalizing its proposed rule or from this Court applying that rule if and when it is finalized.

If the governing regulations change while this case is on appeal, then this Court "must apply the law in effect at the time it renders its decision." *Thorpe v. Hous. Auth. of City of Durham*, 393 U.S. 268, 281 (1969); *Peightal v. Metro. Dade County*, 940 F.2d 1394, 1398 (11th Cir. 1991) ("On appeal, however, it is our duty to apply the law as it exists when we deliver our opinion, even if it has changed since the time of a lower court decision."). This rule "applies with equal force where the change is made by an administrative agency acting pursuant to legislative authorization." *Thorpe*, 393 U.S. at 282.

DEP respectfully submits that it should prevail under existing law on multiple grounds related to justiciability, proximate causation, commandeering, and the scope of the permanent injunction. But if the U.S. Fish and Wildlife Service finalizes its proposed rule during the pendency of this appeal, that would also be sufficient by itself to vacate and remand the judgment and preliminary injunction.

## III.   The district court's injunction violates Tenth Amendment anti-commandeering principles.

The injunction also violates anti-commandeering principles. Under the Tenth Amendment, "the Federal Government may not compel the States to implement, by legislation or executive action, federal regulatory programs." *Printz v. United States*, 521 U.S. 898, 925 (1997). This prohibition is particularly concerned with situations where the federal government "require[s] the States in their sovereign capacity to regulate their own citizens" and "require[s] state officials to assist in the enforcement of federal statutes regulating private individuals." *Reno*, 528 U.S. at 151.

That is precisely what the injunction requires here. The true targets of Plaintiff's lawsuit are private entities allegedly violating the ESA with environmentally damaging septic systems in the North Indian River Lagoon area. For those ESA violations, "any person" can file a suit for injunctive relief against those entities directly. *See* 16 U.S.C. § 1540(g)(1). But Plaintiff did not take that direct route. By taking the indirect route— suing DEP to force it to regulate as Plaintiff would prefer—Plaintiff effectively "commandeer[s] [the] State's ... administrative machinery for federal purposes." *Burban v. City of Neptune Beach*, 920 F.3d 1274, 1281 (11th Cir. 2019).

The injunction requires that DEP "cease to issue new permits for the construction and installation of onsite sewage treatment and disposal systems" in the relevant area, effectively dictating how DEP implements its state-law regulatory authority. R.190 at 3. That judicial command dictates the manner in which DEP may exercise its state-law permitting authority over private parties. This "proposed remedy very likely makes demands of the Department that are not sustainable under the Tenth Amendment's anti-commandeering principle." Doc.16 at 7 (Grant, J., dissenting).

The district court rejected DEP's anti-commandeering argument, reasoning that because "[t]he ESA applies to '*any person*,'" "'[t]he anticommandeering doctrine does not apply when Congress evenhandedly regulates an activity in which both States and private actors engage.'" R.172 at 11. The court cited *Reno*, which rejected an anti-commandeering challenge to a statute that "regulate[d] the States as the owners of data bases." 528 U.S. at 151. But *Reno* distinguished that statute from one that "require[s]

38

the States in their sovereign capacity to regulate their own citizens" or "require[s] state officials to assist in the enforcement of federal statutes regulating private individuals." *Id.* Other courts have similarly explained that while federal law may "pervasively regulate[] states as marketplace participants; the anti-commandeering rule comes into play only when the federal government calls on the states to use their sovereign powers as regulators of their citizens." *Travis v. Reno*, 163 F.3d 1000, 1004-05 (7th Cir. 1998).

That is precisely what the final judgment and injunction do. While the ESA may apply to both private individuals and States, no entity apart from the State has sovereign power to indefinitely deny all septic system permits. That is a quintessential instance of "requir[ing] the States in their sovereign capacity to regulate their own citizens."

This Court has followed that proper view of the Supreme Court's anti-commandeering doctrine. In *Burban v. City of Neptune Beach*, the plaintiff attempted to force a municipal office to issue a form of identification that would entitle her to a concealed carry permit under federal law. 920 F.3d at 1276. This Court affirmed dismissal of the lawsuit on anti-commandeering grounds despite the plaintiff's argument that the relevant law applied to private parties. *Id.* at 1281. The Court rejected that distinction and explained that the plaintiff's "proposal that we require states to issue identification plainly seeks to control how States regulate private parties, as opposed to regulating state activities." *Id.* Just so here: the injunction would require the Florida DEP to regulate its citizens to prevent *them* from allegedly violating a federal statute, which is a paradigmatic commandeering of state authority.

39

The Supreme Court's recent anti-commandeering decisions also support DEP's position. *Murphy v. NCAA* enjoined enforcement of a federal law prohibiting states from authorizing sports gambling because that law violated the anticommandeering principle. 584 U.S. 453, 480 (2018). That decision rejected an argument put forward by the federal government that *Printz* was distinguishable because it involved a commandeering provision that tells a state what it must do whereas *Murphy*'s provision involved a prohibition dictating what a state may not do. *Id.* at 474. The Court explained that "[i]t was a matter of happenstance that the laws challenged in *New York* and *Printz* commanded 'affirmative' action as opposed to imposing a prohibition. The basic principle—that Congress cannot issue direct orders to state legislatures—applies in either event." *Id.* at 475. It also distinguished the statute at issue in *Murphy* from the one that the Court examined in *Reno*, explaining that the *Reno* statute "did not regulate the States' sovereign authority to 'regulate their own citizens.'" *Id.* at 476. *Reno* and other cases in which the Court did not find an anti-commandeering issue all lacked "laws that directed the States either to enact or to refrain from enacting a regulation of the conduct of activities occurring within their borders." *Id.* at 477. But that is precisely what the injunction does here.

The district court's trial opinion also cited *Haaland v. Brackeen*, which rejected anti-commandeering challenges to a federal law regulating adoption and family placement for American Indian children. 599 U.S. 255, 281-91 (2023). But under the law at

issue in *Brackeen*, both the states and private parties could initiate involuntary child custody proceedings, and both the states and private parties were required to perform a "diligent search" for foster placements that satisfied the federal law's criteria. *Id.* at 281-82, 286. Neither statutory requirement, unlike the injunction at issue here, "demand[ed] the use of state sovereign authority." *Id.* at 286.

Finally, the district court's stay order repeated the same conclusion that it made about proximate causation, that "[i]t is not…private parties that are violating the ESA." R.201 at 10. But, as explained above, *supra* at 31-32, an ESA violation by septic tank owners is necessary to Plaintiff's theory of an indirect ESA taking. So the district court was able to conclude that the injunction does not "require the States in their sovereign capacity to regulate their own citizens" only by reaching a legal conclusion at odds with its finding of indirect liability. *Reno*, 528 U.S. at 151. Further, the district court's invocation of federal preemption is a red herring. No one disputes that valid federal legislation can preempt state laws and regulations, R.201 at 10, but "every form of preemption is based on a federal law that regulates the conduct of private actors, not the States," *Murphy*, 584 U.S. at 479. Regardless of whether the ESA is a valid exercise of Congress's Commerce Clause power, "conspicuously absent from the list of powers given to Congress is the power to issue direct orders to the governments of the States." *Id.* at 471. The district court's injunction violated the Tenth Amendment by transgressing this limit on federal authority.

41

This Court's stay order also mistakenly suggested that the *Loggerhead Turtle* decision had already ruled on the relevant anticommandeering issues. Doc.16 at 4-5 (stating that the requirement to apply for an incidental take permit "may 'constitutionally redress[]' plaintiffs' injuries caused by violation of the act"). To the contrary, *Loggerhead Turtle* expressly reserved the question because the parties there did not raise an anticommandeering challenge. 148 F.3d at 1254 n.26 (defendant did "not assert Tenth or Eleventh Amendment immunity" and defendant did not "raise federalism concerns").

## IV. The district court's injunction is unjustifiably broad.

Based on the district court's serious errors regarding standing, proximate causation, and anticommandeering, this Court should vacate the judgment and injunction in their entirety. But even apart from those case-dispositive flaws, the court abused its discretion by issuing an overly broad injunction that violates bedrock federalism principles. In short, "the district court's order is infirm in several respects and raises many serious questions about the scope of federal judicial power." Doc.16 at 7 (Grant, J., dissenting).

In determining the scope of an injunction, courts adhere to the principle that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). This is because "the traditional scope of injunctive relief" is only the "'extent necessary to protect the interests of the parties.'" *Georgia v. President of the U.S.*, 46 F.4th 1283, 1303 (11th Cir. 2022). These equitable limits are particularly important in cases involving

42

States, because "in reviewing a district court's injunction against an agency of state government, [courts] scrutinize the injunction closely to make sure that the remedy protects the plaintiffs' federal constitutional and statutory rights but does not require more of state officials than is necessary to assure their compliance with federal law." *Clark*, 60 F.3d at 604. A district court whose injunction exceeds what is required by federal law "will be deemed to have committed an abuse of discretion." *Id.*

At a minimum, this Court should vacate the injunction's requirements that DEP cease issuing new septic permits and develop and implement programs to feed and monitor manatees. These mandates compel DEP to do far more than would be required to comply with the ESA. Even assuming jurisdiction and liability, any remedy should have extended no farther than ordering DEP to seek a take permit. If DEP is unlawfully taking manatees, then a permit would cure any violation by providing federal authorization and oversight of any incidental takings.

The district court's additional mandates beyond seeking a permit impinge significantly on state sovereignty by compelling the wrong agency to create new wildlife programs from whole cloth and to potentially engage in uncompensated takings of private property. As discussed above, DEP has no authority or expertise to engage in wildlife feeding and monitoring programs. *Supra* at 25-29. Moreover, like the other branches, federal courts are bound by the Takings Clause. *Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot.*, 560 U.S. 702, 713-14 (2010). Here, the district court potentially committed a taking without just compensation by indefinitely depriving landowners

who require the use of septic systems of the ability to develop or build permanent homes on their property. *See Knick v. Scott*, 588 U.S. 180, 189-90 (2019). And, worse still, the landowners will suffer under these restrictions even though they are not parties to this case and have never been found to have violated the ESA.

The district court's injunction here sweeps even more broadly than what was imposed by the outlier ESA decisions the court cited as its model. In *Strahan v. Coxe*, for instance, a case that involved permitting of fishing equipment that harmed endangered whales, the First Circuit affirmed the district court's decision to award limited injunctive relief. 127 F.3d 155, 171 (1st Cir. 1997). There, the district court required only that the state defendant apply for an incidental take permit, prepare a proposal for modifying fishing equipment, and convene a working group (despite plaintiff's arguments that the court should have also required mailings to fishing boats and weekly surveillance flights for whales). *Id.* at 158; *Strahan v. Coxe*, 939 F. Supp. 963, 989 (D. Mass. 1996).

The First Circuit concluded that "[t]he district court was not required to go any farther than ensuring that any violation would end," which the take permit requirement accomplished.[5] 127 F.3d at 171. The injunction in that case required the state agency

_____

[5] Of note, the National Marine Fisheries Service denied the Commonwealth's request for an incidental take permit, submitted in compliance with the court's order, explaining in part that "NMFS determined that it was not appropriate to consider authorizing the State's potential incidental take of right whales by commercial fishing

only to "*consider* means by which" fishing equipment could be modified and "[t]he injunction did not order specific modifications, *let alone ban the licensure scheme*. Indeed, the court's order did not even command the Commonwealth to restrict its permitting process in any way." *Id.* at 168 (emphasis added).

Here, by contrast, the district court's injunction places an indefinite ban on new septic permits throughout an entire region of the State and requires DEP to create new manatee feeding, monitoring, and reporting programs out of whole cloth. Even under the logic of *Strahan*, the district court's decision to halt all new septic tank permits and require a state agency to create new programs was an abuse of discretion.

The district court itself acknowledged these equitable concerns in prior orders. At the motion to dismiss stage, the court concluded that the redressability prong of standing was satisfied despite concerns that DEP had a statutory duty to oversee the septic tank permitting program because "Plaintiff requests multiple injunctions that are unrelated to the denial of new permits." R.112 at 10. It also tabled the anticommandeering challenge by holding that it could "'craft an injunction that orders [Defendant] to stop violating the ESA, but avoids' violating the Tenth Amendment" by "compel[ling] FDEP to comply with the ESA by regulating private individuals." *Id.* at 18.

---

through a permit application process." *See* Taking of Endangered and Threatened Marine Mammals Incidental to Commercial Fishing Operations; Commonwealth of Massachusetts, 62 Fed. Reg. 5385, 5386 (Feb. 5, 1997).

After trial, the court noted again that "'unique constitutional implications exist whenever a federal district court is asked to order a state entity to take regulatory action'" but concluded that redressability was satisfied because "ordering a state agency to apply for an ITP is included within that equitable power." R.172 at 9-10.

Despite these early indications of restraint, the district court nevertheless adopted Plaintiff's proposed injunction nearly verbatim, R.190, over DEP's objections as to its scope, R.180. In other words, the court did not stop at ordering DEP to apply for a take permit, despite specifically noting the statutory and constitutional problems with ordering broader injunctive relief. In doing so, the district court abused its discretion and entered an overbroad and inequitable injunction that should be vacated even if this Court agreed with the decision below on jurisdiction and liability.

## CONCLUSION

This Court should reverse the judgment of the district court and vacate the permanent injunction.

Dated: July 28, 2025

Jeffrey Brown
Department of Environmental Protection
390 Commonwealth Blvd., MS 35
Tallahassee, Florida 32399-3000
Telephone: (850) 245-2242
Jeffrey.Brown@FloridaDEP.gov

Respectfully submitted,

*/s/ Jeffrey M. Harris*
Jeffrey M. Harris
Bryan Weir
Nicholas B. Venable*
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423
jeff@consovoymccarthy.com

*Supervised by principals of the firm admitted to practice in Virginia*

*Counsel for Defendant-Appellant*

## CERTIFICATE OF COMPLIANCE

This brief complies with Rule 32(a)(7) because it contains 11,570 words, excluding the parts that can be excluded. It also complies with Rule 32(a)(5)-(6) because it's prepared in a proportionally spaced face using Microsoft Word 2016 in 14-point Garamond font (with 16-point and 15-point headings).

Dated: July 28, 2025                                    */s/ Jeffrey M. Harris*

## CERTIFICATE OF SERVICE

I e-filed this brief, which will email everyone requiring notice.

Dated: July 28, 2025                                    */s/ Jeffrey M. Harris*

48