Nos. 25-11612 & 25-11821

---

UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

---

BEAR WARRIORS UNITED, INC.,
*Plaintiff-Appellee*

v.

SECRETARY OF THE FLORIDA DEPARTMENT OF
ENVIRONMENTAL PROTECTION,
*Defendant-Appellant*

---

Appeal from the United States District Court for the Middle District of
Florida, No. 6:22-cv-02048-CEM-LHP (Mendoza, J.)

---

**PROPERTY AND ENVIRONMENT RESEARCH CENTER'S
AMICUS BRIEF SUPPORTING DEFENDANT-
APPELLANT/REVERSAL**

---

DYLAN P. SOARES
JONATHAN WOOD
Property and Environment
Research Center (PERC)
2048 Analysis Drive, Suite A
Bozeman, Montana 59718-6829
Telephone: (406) 587-9591
Email: dsoares@perc.org

*Counsel for Amicus Curiae
Property and Environment Research Center*

Nos. 25-11612 & 25-11821, *Bear Warriors United v. Lambert*

## Certificate of Interested Persons

Pursuant to 11th Cir. R. 26.1-1 and 26.1-2, the undersigned counsel certifies that the following persons and entity have an interest in the outcome of this case and were omitted from the Certificates of Interested Persons in previously filed briefs.

1. Property and Environment Research Center (PERC)—Amicus Curie

2. Wood, Jonathan—Counsel for Amicus Curie PERC

3. Soares, Dylan P.—Counsel for Amicus Curie PERC

Dated: August 4, 2025

*/s/ Dylan P. Soares*
Dylan P. Soares
*Counsel of Record for*
*Amicus Curiae*

C-1

## Corporate Disclosure Statement

The Property and Environment Research Center is a nonprofit corporation organized under the laws of Montana, which has no parent companies, subsidiaries, or affiliates that have issued shares to the public.

# Table of Contents

Certificate of Interested Persons ............................................................ C-1

Corporate Disclosure Statement .............................................................. i

Table of Contents ................................................................................... ii

Table of Authorities .............................................................................. iv

Statement of Interest ............................................................................... 1

Statement of the Issues ........................................................................... 3

Summary of the Argument ...................................................................... 3

Argument ................................................................................................. 5

   I.    The Avoidance Canon Counsels Against Interpreting the ESA to Commandeer States .................................................................. 7

       A.   The district court's interpretation of the ESA raises a serious concern under the anticommandeering doctrine ..... 8

       B.   The commandeering concern cannot be avoided by recasting the issue in preemption terms ............................ 13

       C.   The ESA does not unambiguously compel this interpretation ..................................................................... 16

  II.    The decision below also subverts the ESA's cooperative federalism design .......................................................... 20

Conclusion ............................................................................................. 23

Certificate of Compliance with Type-Volume Limit, Typeface Requirements, and Type-Style Requirements ...................................... 25

Certificate of Service ................................................................... 27

# Table of Authorities

## Cases

*Burban v. City of Neptune Beach, Fla.*, 920 F.3d 1274 (11th Cir. 2019) .................................................................................. 7, 8, 9, 10, 12

*Ctr. for Biological Diversity v. Little*, 724 F. Supp. 3d 1113 (2024) ....... 15

*Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 2024 WL 3966730 (D. Mont. Aug. 28, 2024) ......................................................... 15

*HM Florida-ORL, LLC v. Gov. of Florida*, 137 F.4th 1207 (11th Cir. 2025) .......................................................................................................... 8

*Loggerhead Turtle v. Cnty. Council of Volusia Cnty., Fla.*, 148 F.3d 1231 (11th Cir. 1998) ............................................................................... 11, 12

*Murphy v. Nat'l Collegiate Athletic Assoc.*, 584 U.S. 453 (2018). 5, 8, 10, 12, 13, 14, 16, 17

*New York v. United States,* 505 U.S. 144 (1992) ...................................... 9

*Printz v. United States*, 521 U.S. 898 (1997). ........................................... 8

*Reno v. Condon*, 528 U.S. 141 (2000) ....................................................... 9

*Strahan v. Coxe*, 127 F.3d 155 (1st Cir. 1997) ....................................... 13

## Statutes

16 U.S.C. § 1532 .............................................................................. 7, 17, 19

16 U.S.C. § 1533 ................................................................................. 7, 17

*16 U.S.C. § 1535 ................................................................. 5, 6, 14, 19, 20

16 U.S.C. § 1536 ..................................................................................... 19

16 U.S.C. § 1538 ........................................................................ 7, 15, 17

Fla. Stat. § 403.061 ................................................................................4

Fla. Stat. § 403.067 ................................................................................4

**Other Authorities**

Dr. Katherine Wright & Shawn Regan, *Missing the Mark: How the Endangered Species Act Falls Short of Its Own Recovery Goals* (July 26, 2023)................................................................................................2

U.S. Fish and Wildlife Service, *ESA Basics: 50 Years of Conserving Endangered Species* (2023)....................................................................6

U.S. Fish and Wildlife Service, *Special Agent* (2012)..............................7

*J.B. Ruhl, *State and Local Government Vicarious Liability Under the ESA*, 16 Nat. Res. & Env't 70 (2001). ......................... 10, 12, 18, 19, 23

Jonathan H. Adler, *Judicial Federalism and the Future of Environmental Regulation*, 90 Iowa L. Rev. 377 (2005)...............2, 3, 6

Jonathan Wood, *Clear as Mud*, PERC (Dec. 20, 2022)..........................22

Jonathan Wood, *Property Rights can Resolve Conflict over Chesapeake Bay Oysters*, PERC (Nov. 29, 2018)....................................................22

Kelly L. Westover, *Seagrass Credits for Sale*, PERC (Mar. 1, 2010) .....22

PERC, *A Field Guide for Wildlife Recovery: The Endangered Species Act's Elusive Search to Recover Species—and What to Do About It* (2023) ..............................................................................................2, 3

PERC, *Comment Recommending Changes to Regulations Implementing 16 U.S.C. § 1535* (June 2025) .......................................................3, 20

Robert Bonnie et al., *Understanding Rural Attitudes Toward the Environment and Conservation in America*, Duke Nicolas Institute

v

(2020). ..........................................................................................6

Temple Stoellinger, *Wildlife Issues Are Local—So Why Isn't ESA Implementation?*, 44 Ecology L.Q. 681 (2017)...........................2, 3, 6, 20

Terry Anderson & P.J. Hill, *Environmental Federalism*, PERC Policy Series (1996). .....................................................................................6

U.S. Bureau of Lab. Stat., *Fish and Game Wardens* (May 2023) ............7

U.S. Dep't of the Interior, *2017/2018 Annual Performance Plan & 2016 Report* (2017)............................................................................................2

Whitney Tilt, *Elk in Paradise: Conserving Migratory Wildlife and Working Lands in Montana's Paradise Valley*, PERC (2020) .............22

Zach Raff, *Delivering on the Promise of Water Quality Markets*, in *The Future of Water Markets: Obstacles and Opportunities*, at 37, PERC Policy Report (2022) ..........................................................................21

**Rules**

50 C.F.R. § 17.21 ...........................................................................17

**Record**

Doc. 16 ...........................................................................................13

Doc. 22 ...........................................................................................22

R. 134..........................................................................................4, 9

R. 172..........................................................................................4, 13

R. 184-13.........................................................................................4

R. 188..............................................................................................4

R. 190.........................................................................................5, 16

vi

The Property and Environment Research Center (PERC) respectfully submits this amicus brief supporting Defendant-Appellant, the Florida Department of Environmental Protection (DEP), and reversal of the district court.[1]

**Statement of Interest**

PERC is the national leader in market solutions for conservation, with 45 years of research and a network of respected scholars and practitioners. Through research, law and policy, and innovative field conservation programs, PERC explores how aligning incentives for environmental stewardship produces sustainable outcomes for land, water, and wildlife. Founded in 1980, PERC is nonprofit, nonpartisan, and proudly based in Bozeman, Montana.

For decades, PERC has sought to make the Endangered Species Act (ESA) work better to promote species recovery.[2] To date, recovery has

---

[1] Pursuant to Fed. R. App. P. 29(a)(2), all parties have consented to the filing of this amicus brief, with Plaintiff-Appellee asking that the brief further state that they take no position on its filing. No counsel for a party authored this brief in whole or in part, and no party or counsel for a party contributed money intended to fund the preparation or submission of this brief. No person other than PERC, its members, or its counsel contributed money intended to fund the preparation or submission of this brief.

[2] *See, e.g.,* PERC, *A Field Guide for Wildlife Recovery: The Endangered Species Act's Elusive Search to Recover Species—and What to Do About It*

been disappointingly rare, with only 3% of listed species recovered and a similarly small percentage improving.[3] This is substantially below what the Fish and Wildlife Service (FWS or Service) expected. According to PERC's research, only 13 species recovered of the 300 species the Service predicted to do so by the ESA's 50th anniversary.[4]

Incorporating federalism principles into the ESA's implementation is a critical step to reversing these trends.[5] As PERC-affiliated scholars' research has shown, Congress intended states to play a leading role in the recovery of endangered and threatened species.[6] And PERC has

---

(2023), https://www.perc.org/wp-content/uploads/2023/09/PERC_Field-Guide-for-Wildlife-Recovery.pdf.

[3] *See id.* at 5. *See also* U.S. Dep't of the Interior, *2017/2018 Annual Performance Plan & 2016 Report* 15 (2017), https://www.osmre.gov/sites/default/files/pdfs/DOI_PerformancePlan_2017-2018.pdf (reporting that only 4% of listed species were improving and that this rate had been consistent over the previous 5 years).

[4] Dr. Katherine Wright & Shawn Regan, *Missing the Mark: How the Endangered Species Act Falls Short of Its Own Recovery Goals* (July 26, 2023), https://www.perc.org/2023/07/26/missing-the-mark/.

[5] *See* PERC, *Empower States to Recover Species*, in PERC, *Field Guide*, *supra*, at 23–29.

[6] *See, e.g.*, Temple Stoellinger, *Wildlife Issues Are Local—So Why Isn't ESA Implementation?*, 44 Ecology L.Q. 681 (2017); Jonathan H. Adler, *Judicial Federalism and the Future of Environmental Regulation*, 90 Iowa L. Rev. 377, 428–30 (2005).

advocated reforms to encourage states to play a bigger role in recovering species through novel and incentive-based programs.[7] But states have been prevented in taking that role by federal policies, regulations, and court decisions that limit their flexibility or impose particular approaches on them.[8] The decision below is one of the most egregious examples of that problem.

**Statement of the Issues**

Whether, consistent with the anticommandeering doctrine, a state can violate the ESA by regulating conduct that harms a listed species but does not eliminate such harm, and, if its regulation is found inadequate in advancing federal policy, be ordered to enforce a new regulation changeable only with federal permission.

**Summary of the Argument**

To improve water quality within the North Indian River Lagoon, DEP has worked with stakeholders to develop a comprehensive plan to

---

[7] *See, e.g.*, PERC, *Empower States*, *supra*; PERC, *Comment Recommending Changes to Regulations Implementing 16 U.S.C. § 1535* (June 2025), https://www.perc.org/wp-content/uploads/2025/06/FINAL-PERC_6.18.2025_Comment_3.ESAFederalism.pdf.

[8] *See* Stoellinger, *supra*, at 701–08; Adler, *supra*, 428–30.

3

address nitrogen pollution from agricultural, urban, and other sources. *See* Fla. Stat. §§ 403.061; 403.067(7). One of the ways in which DEP reduces nitrogen pollution is by limiting where septic systems can be installed and requiring upgrades to reduce pollution from these systems. *See id*. These efforts have reduced nitrogen pollution by nearly 150,000 pounds per year, 55% of the state's goal. R. 188 at 62.[9] In addition to improving water quality, DEP's efforts have also benefitted the threatened West Indian manatee by improving the species' habitat. *See* R. 184-13 at 3 (discussing how the "[s]eagrass is slowly recovering").

In this case, Bear Warriors accuses DEP of taking manatees and, therefore, violating the ESA. It doesn't accuse DEP itself of harming manatees. R. 172 at 4 (explaining that Bear Warriors does not allege that DEP "purposefully take[s] manatees"). Instead, it claims that private septic tank owners are contributing to nitrogen pollution, which is harming manatees. R. 134 at 12–13. DEP is responsible, Bear Warriors asserts, because its regulation of septic systems benefits manatees but not enough to fully achieve federal purposes. *Id*. Adopting Bear Warriors'

---

[9] Citations to the district court docket appear as R. X at Y, and citations to this Court's docket appear as Doc. X at Y.

theory, the district court created a new state policy—a total ban on septic system installation, as well as new manatee monitoring and feeding programs—and ordered DEP to enforce this policy unless and until it obtains federal approval to change it. R. 190.

The district court's interpretation of the ESA is unsupported by the statute's text and purposes, which seek to encourage states' contributions to species recovery and not to penalize them. *See, e.g.,* 16 U.S.C. § 1535. It also raises serious constitutional questions under the anticommandeering doctrine that are exacerbated by the scope of the court's order. *See Murphy v. Nat'l Collegiate Athletic Assoc.*, 584 U.S. 453 (2018). Simply put, the ESA cannot be used by activist litigants to compel states to adopt their preferred regulations to advance species recovery. Instead, subject to an exceedingly narrow preemption provision, 16 U.S.C. § 1535(f), the ESA embraces environmental federalism.

This Court should reverse the decision below.

## Argument

The ESA seeks to recover species to the point that they are no longer threatened with extinction. *See* FWS, *ESA Basics: 50 Years of*

*Conserving Endangered Species* (2023).[10] Federalism is a core component of how the ESA pursues that goal. *See* Adler, *supra*, at 384. Legislating against a backdrop of state primacy over wildlife management, *see* Stoellinger, *supra*, at 684, Congress took great pains to limit the ESA's impact on state authority and to give state's flexibility in wildlife management. *See* 16 U.S.C. § 1535. And for good reason. States are closer to the people and on-the-ground conservation challenges and, thus, they are better able to tailor solutions to local conditions. *See* Terry Anderson & P.J. Hill, *Environmental Federalism*, PERC Policy Series (1996).[11] States are also more trusted by private landowners, enabling them to work with landowners on proactive and innovative conservation efforts. *See, e.g.*, Robert Bonnie et al., *Understanding Rural Attitudes Toward the Environment and Conservation in America*, Duke Nicolas Institute 19–20 (2020).[12] And states have more personnel to enforce wildlife rules than

---

[10] https://www.fws.gov/sites/default/files/documents/endangered-species-act-basics-february-2023.pdf.

[11] https://www.perc.org/wp-content/uploads/2018/02/ps8.pdf.

[12] https://nicholasinstitute.duke.edu/sites/default/files/publications/understanding-rural-attitudes-toward-environment-conservation-america.pdf.

federal agencies have.[13]

The decision below upends this regime by interpreting the ESA's prohibition against the "take" of endangered species[14] to assert federal control over any state regulation or permitting of private conduct that may harm species. 16 U.S.C. § 1538(a). *See* 16 U.S.C. § 1532(19) (defining "take" as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct"). This interpretation is counter to the statute's text and purpose and undermines environmental federalism as a tool for species conservation.

## I.    The Avoidance Canon Counsels Against Interpreting the ESA to Commandeer States

This Court's precedents disfavor any interpretation of a statute that would raise serious constitutional concerns. *See, e.g.*, *Burban v. City of Neptune Beach, Fla.*, 920 F.3d 1274, 1280–82 (11th Cir. 2019). To be

---

[13] *See* U.S. Bureau of Lab. Stat., *Fish and Game Wardens* (May 2023), https://www.bls.gov/oes/2023/may/oes333031.htm (more than 6,000 state game wardens); FWS, *Special Agent* (2012) (approximately 250 special agents to enforce federal wildlife laws), https://www.fws.gov/sites/default /files/documents/FW-1010-Special-Agent.pdf.

[14] In some circumstances, regulations may extend this prohibition to threatened species, like the West Indian manatee, as well. 16 U.S.C. § 1533(d).

7

sure, a court cannot give a statute an interpretation that its text will not bear to avoid such concerns. *See HM Florida-ORL, LLC v. Gov. of Florida*, 137 F.4th 1207, 1232–33 (11th Cir. 2025). But if a statute is susceptible to an interpretation consistent with constitutional principles, that interpretation must be preferred. *See Burban*, 920 F.3d at 1280–82.

### A. The district court's interpretation of the ESA raises a serious concern under the anticommandeering doctrine

Under the anticommandeering doctrine, the federal government cannot "compel the States to implement . . . federal regulatory programs." *Printz v. United States*, 521 U.S. 898, 925 (1997). That doctrine is one of the Constitution's structural protections of liberty, promotes political accountability, and requires the federal government to internalize the costs of its policies rather than shifting them to the states. *Murphy*, 584 U.S. at 473–74 (2018).

The Supreme Court has found federal statutes to offend the doctrine that: 1) prohibited states from modifying laws to authorize private conduct that federal policy wished to discourage, *see id.*; 2) required state officials to help implement federal policy, *see Printz*, 521 U.S. 898; and 3) forced states to conduct actions to advance federal policy,

8

*see New York v. United States,* 505 U.S. 144 (1992). This Court has also recognized that where a state has voluntarily chosen to act, federal law cannot require it to do more to advance federal priorities. *Burban*, 920 F.3d at 1281. Under these cases, if the federal government wishes to restrict private conduct to advance a federal policy aim, its only option is to regulate individuals directly; it cannot control how states regulate that conduct. *See Reno v. Condon*, 528 U.S. 141, 150 (2000).

This doctrine is clearly implicated by the interpretation of the ESA underlying Bear Warriors' claim. The district court did not find that DEP is directly polluting North Indian River Lagoon, degrading manatee habitat, and, therefore, violating the ESA's take prohibition. R. 134 at 16–17. Instead, it found that private party wastewater discharge systems cumulatively caused these harms. *Id.* The state is only implicated because it regulates these systems to protect water quality, which incidentally benefits manatees but allegedly does not entirely remove the risk of harm to manatees. *Id.* at 12–13. According to Bear Warriors, regulating private conduct that harms a species makes the state liable

under the ESA for those harms, even if the effect of the regulation is to reduce them.[15]

This interpretation, if correct, would render the ESA a quintessential example of a statute that "seeks to control how States regulate private parties" and is unconstitutional under the anticommandeering doctrine. *Burban*, 920 F.3d at 1281 (quoting *Reno*, 528 U.S. at 150). That this interpretation is based on a provision that tells states what they must not do, rather than one that imposes affirmative obligations on them, is immaterial. *See Murphy*, 584 U.S. at 475 ("It was a matter of happenstance that the laws challenged in *New York* and *Printz* commanded 'affirmative' action as opposed to imposing a prohibition. The basic principle . . . applies in either event.").

To clarify the issue, consider how the anticommandeering doctrine would apply to a hypothetical regulation to explicitly extend the ESA to these circumstances. Such a rule might say something like "States violate the take prohibition not only if they harm endangered or threatened

---

[15] Whether the claim is characterized as challenging the agency's failure to regulate sufficiently or as the issuance of a permit authorizing harmful activity is mere semantics that does not affect the legal analysis. *See* J.B. Ruhl, *State and Local Government Vicarious Liability Under the ESA*, 16 Nat. Res. & Env't 70 (2001).

species but also if they regulate private conduct that can harm endangered or threatened species and their regulations do not prevent that harm." This is precisely the sort of command, in the form of a regulation rather than a statute, that the Supreme Court struck down in *Murphy* and *New York*. If such a regulation would raise anticommandeering concerns, there is no reason Bear Warriors' interpretation of the ESA would not violate the anticommandeering rule as well.

Bear Warriors argues that *Loggerhead Turtle v. County Council of Volusia County, Florida*, dispenses with any anticommandeering concerns here, but it ignores *Loggerhead*'s limited holding. 148 F.3d 1231 (11th Cir. 1998). In that case, this Court reviewed the dismissal of a complaint alleging that a county violated the ESA because its regulation of beach driving and beachfront lights did not prevent harm to ESA-listed turtles. *Id.* This Court acknowledged the anticommandeering doctrine concern in the case, despite the county not raising it, and expressly declined to resolve that issue. *Id.* at 1254, n.26 ("Assuming, without deciding," that ordering the county to regulate "would violate the separation of powers," . . .). Instead, *Loggerhead* was resolved on narrow

11

standing grounds at a preliminary stage. First, it held that harms to turtles were fairly traceable to the state's regulatory scheme for standing purposes. *Id.* at 1248–49. Next, it held that the potential for a court to craft a remedy that avoided anticommandeering concerns meant that those harms were potentially redressable, again for standing purposes. *Id.* at 1250–55. That standing holding provides no basis to ignore the anticommandeering problem with Bear Warriors' interpretation of the ESA. Therefore, *Loggerhead* does not control this case; this Court's subsequent decision in *Burban* does. *See Burban*, 920 F.3d 1274.

Admittedly, enforcing the ESA against the state is easier than enforcing it against countless private parties whose individual conduct may have no appreciable effect on listed species. *See* Ruhl, *supra*, 70–71. And this is presumably why Bear Warriors has chosen the state as its target. But that is no basis for an end-run around the anticommandeering doctrine. *Id.* at 76–77. As the Supreme Court has explained, the doctrine ensures that, where the federal government establishes a costly regulatory regime that is difficult to enforce, the federal government must bear that burden rather than shifting the cost and regulatory challenge to the states. *Murphy*, 584 U.S. at 474.

**B.    The commandeering concern cannot be avoided by recasting the issue in preemption terms**

Bear Warriors also points to the out-of-circuit case of *Strahan v. Coxe* to argue against application of the anticommandeering doctrine here. 127 F.3d 155 (1st Cir. 1997). That case, while closer to this one than *Loggerhead*, is nonetheless distinguishable, contrary to this Court's precedents, and unpersuasive. In *Strahan*, the First Circuit held that Massachusetts violated the ESA by permitting fishing that harmed endangered Northern Right whales. *Id.* at 158. The court held that this did not violate the anticommandeering doctrine by recharacterizing the issue as a question of federal preemption. *Id.* at 170. The district court, and the motions panel that denied DEP's request for a stay, offered similar reasoning. *See* Doc. 16 at 4–5; R. 172 at 10–12.

In this respect, *Strahan* has been effectively overruled by subsequent Supreme Court precedent. In *Murphy*, the Supreme Court addressed the relationship between anticommandeering and preemption, holding that the federal government cannot use preemption to regulate state's exercise of their sovereign authority but can only preempt state regulation under familiar preemption principles. 584 U.S. at 477–80. Where the federal government imposes restrictions or confers rights on

13

private actors, it may preempt state regulation of that same private conduct through the established conflict, express, or field preemption tests. *Id.* Neither *Strahan* nor the decision below applied any of these tests.

Moreover, none of these preemption tests are even plausibly implicated here. Conflict preemption applies where a state requires private parties to do something prohibited by federal law or to refrain from something required by federal law. *See id.* at 478–79. That is not the case here. Bear Warriors does not argue that DEP's septic system regulations require anyone to harm manatees. A private actor could comply with both state and federal law, and the state can enforce its regulations without interfering with federal officials' enforcement of the ESA.

Express preemption also does not apply. The ESA contains an exceedingly narrow preemption provision that applies, in limited circumstances, only to state regulation of take or interstate commerce in listed species. 16 U.S.C. § 1535(f). Neither type of state regulation is at issue here.

Finally, the ESA does not preempt the field of septic system regulation. Indeed, the statute says nothing about the subject. Any federal regulation of this conduct is incidental to the ESA's prohibition on take. *See* 16 U.S.C. § 1538(a). There is no basis in the Act's text or precedent for the proposition that, by prohibiting take, Congress preempted the field of regulating every type of conduct that may cause even temporary harm to listed species, which would be a shockingly broad preemption of state authority. It would mean that Congress has preempted not only the entire field of water quality regulation but also homebuilding, farming, hunting, fishing, habitat restoration, and other activities regulated by states every day.[16] The ESA's text contains no indication that Congress wished to preempt such state regulation. And, paradoxically, interpreting the ESA to implicitly do so would harm species because the Service does not have the capacity to exclusively regulate all these activities—and countless others.

---

[16] Lawsuits like this one are growing more frequent. Recently, for instance, district courts in Montana and Idaho have forced states to limit trapping to advance the ESA's goals. *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 2024 WL 3966730 (D. Mont. Aug. 28, 2024); *Ctr. for Biological Diversity v. Little*, 724 F. Supp. 3d 1113 (2024).

Any lingering question about preemption's application to this case is answered by the injunction the district court issued here. When a state law is preempted, the remedy is to void that state law, leaving the conduct to be regulated, if at all, by federal officials under federal law. *See Murphy*, 584 U.S. at 477 (all preemption works in the same way, with "the federal law tak[ing] precedence and the state law [being] preempted"). Here, Bear Warriors does not seek to end state regulation of septic systems, which would certainly be worse for manatees since the state regulation provides incidental benefits to the species by improving water quality. Instead, it seeks to impose on the state a new, stricter policy through federal command. Granting that request, the district court effectively converted the state's permitting regime into a complete ban. R. 190. Moreover, it prohibited the state from changing that court-imposed policy unless it obtains permission from the Service. *Id.* Such federal control over a state setting its own regulatory policy cannot be reconciled with *Murphy*. 584 U.S. at 474–77.

## C. The ESA does not unambiguously compel this interpretation

Given these serious constitutional concerns, Bear Warriors' interpretation of the ESA can only be accepted if the Act's text

unambiguously compels it. Fortunately, that interpretation is neither the only plausible reading of the statute nor the best one.

As noted above, the ESA prohibits "any person" from taking an endangered species, and the Service can prohibit take of threatened species through regulation. 16 U.S.C. §§ 1533(d), 1538(a). This prohibition applies not only to individuals but also state officials. 16 U.S.C. § 1532(13). Nothing in the definition of take, *see* 16 U.S.C. § 1532(19), nor in the inclusion of states in the take prohibition, requires the Act to be interpreted to reach states' exercise of regulatory authority.

Instead, the more natural reading is that the prohibition applies to states in the same way that it applies to individuals. Thus, a state official could violate the prohibition if, without a permit, she trapped an endangered species, transported a listed species, or killed or injured a species by destroying its habitat. 16 U.S.C. § 1538(a). And the Service routinely permits states to engage in these activities. *See, e.g.*, 50 C.F.R. § 17.21(c)(3)(iv) (authorizing state officials to take species that pose a threat to human safety). Because this interpretation would apply the ESA "equally to state and private actors," it raises no anticommandeering concern. *Murphy*, 584 U.S. at 476. But there is no

17

private actor equivalent to what Bear Warriors wants imposed in this case.

Interpreting this prohibition to reach state regulation or permitting of private conduct that may harm species has been described by one leading ESA scholar as "outside the bounds of legal coherence." Ruhl, *supra* at 71. Professor Ruhl notes that it is incredibly common for conduct to be regulated by multiple agencies for multiple purposes. *Id.* When one agency issues a permit for purposes of the program it implements, it does not assume that the private party will ignore other agencies' requirements, much less become responsible if the private party makes that choice. *Id.* ("Must states assume that the *federal* government will fail adequately to enforce the *federal* ESA? Are states at fault when the federal government lives up to that assumption?") Yet Bear Warriors' theory rests on precisely such an assumption.[17]

State liability for harm resulting from private conduct it regulates also conflicts with the ESA's text and structure. The Act has a provision that makes regulators responsible, to a degree, for harm caused by

---

[17] As Professor Ruhl has observed, if this "vicarious liability" theory has any plausible basis, it is against federal agencies that fail to regulate or enforce their own regulations. *Id.* at 75.

regulated parties. Ruhl, *supra* at 75. Section 7 of the Act requires federal agencies to utilize all their authorities to further the ESA's objectives and to obtain approval from the Service for harm that may result from the federal agencies' activities. 16 U.S.C. § 1536. The decision below imposes on states obligations like Section 7 despite Congress limiting that provision to federal agencies and omitting similar language from Section 6. *Compare* 16 U.S.C. § 1535, *with* 16 U.S.C. § 1536. Additionally, if the take prohibition already imposed this requirement on federal agencies, Section 7 would be superfluous. Ruhl, *supra*, at 75. *See* 16 U.S.C. § 1532(13) (defining any person to include federal agencies or officials).

Professor Ruhl sums up the issue well. "If you are for ends justifying means, you will find [this interpretation] irresistible." Ruhl, *supra* at 75. It allows activist litigants to use the ESA to control state regulation rather than pursue the more difficult task of proving violations by particular individuals. *Id.* at 70. But "if you believe in the rule of law, you will vigorously oppose" this interpretation, which "flies in the face of the basic structure of the ESA, penalizes states for the failures of the federal government in enforcing federal law, and disrupts the Constitution's delicate federal-state relationship." *Id.* at 75. For these reasons, this

Court should reject Bear Warriors' interpretation to avoid serious constitutional concerns under the anticommandeering doctrine.

## II.    The decision below also subverts the ESA's cooperative federalism design

The ESA was never meant to displace states as primary stewards of wildlife and habitat within their borders. *See* PERC, *Comment Recommending Changes to Regulations Implementing 16 U.S.C.*, *supra*. Instead, Congress built robust federalism provisions into the Act to ensure states play a leading role in conserving species. *See id*. For example, the ESA directs FWS to "cooperate to the maximum extent practicable with the States" in implementing the Act. 16 U.S.C. § 1535(a). It provides for cooperative agreements where states with adequate conservation programs can assume meaningful leadership for the management and recovery of listed species. 16 U.S.C. § 1535(c). Congress even provided that states that enter into cooperative agreements with the Service would have to sign-off on federal regulations governing take of listed species within that state's borders. 16 U.S.C. § 1535(g). *See* Stoellinger*, supra*, at 722–23. This cooperative federalism approach reflects a recognition that states are often closer to local conservation issues, possess police powers over land and water use, and can tailor

solutions to incentive conservation and species recovery in ways a one-size-fits-all federal scheme cannot.

Given this statutory structure, it would be perverse to interpret the ESA to empower litigants to impose on states particular regulatory approaches. Yet, that is exactly what the district court's order does. This heavy-handed intrusion undermines the partnership Congress envisioned and treats the state as a subordinate regulatory agency, rather than a collaborator. It also discourages innovation: Why should a state invest in proactive conservation measures or creative regulatory solutions if, at any time, it might be commandeered and subjected to federal micro-management?

Consider the myriad ways that a state might choose to improve aquatic habitat for a listed species. It could choose to focus on regulating the sources of water pollution, as the district court compelled DEP to do. But it could also set up a water quality trading market,[18] incentivize landowners to conserve or restore wetlands to remove pollution before it

---

[18] Zach Raff, *Delivering on the Promise of Water Quality Markets*, in *The Future of Water Markets: Obstacles and Opportunities*, at 37, PERC Policy Report (2022), https://www.perc.org/wp-content/uploads/2022/09/PPR-Water-Markets-220916-WEB.pdf#page=39.

reaches waterways,[19] encourage oyster[20] or seagrass restoration[21] to filter pollution in waterways, prioritize habitat restoration in a particular area rather than pursue general regulation,[22] or separate responsibility for regulating water quality and recovering species into separate agencies, such as Florida has done.[23] The decision below eliminates this flexibility by allowing litigants to force a state to use direct regulation to eliminate any risk of harm to species, unless the state can obtain federal permission to pursue another approach. Rather than preserving state authority and requiring federal cooperation with state conservation efforts, the decision below vitiates state authority and makes it servient to federal priorities.

---

[19] Jonathan Wood, *Clear as Mud*, PERC (Dec. 20, 2022), https://perc.org/2022/12/20/clear-as-mud/.

[20] Jonathan Wood, *Property Rights can Resolve Conflict over Chesapeake Bay Oysters*, PERC (Nov. 29, 2018), https://www.perc.org/2018/11/29/property-rights-can-resolve-conflict-over-chesapeake-bay-oysters/.

[21] Kelly L. Westover, *Seagrass Credits for Sale*, PERC (Mar. 1, 2010), https://www.perc.org/2010/03/01/seagrass-credits-for-sale/.

[22] Whitney Tilt, *Elk in Paradise: Conserving Migratory Wildlife and Working Lands in Montana's Paradise Valley*, PERC (2020), https://www.perc.org/wp-content/uploads/2020/07/Elk-In-Paradise.pdf.

[23] Doc. 22 at 2–4.

This decision could lead to perverse results in other ways. Because the trigger for the state's liability in this case is that it regulates septic systems, the implicit signal that the decision sends to states is to forego regulation of activities that may harm listed species and, thereby, avoid the litigation risk and red tape that follows. Ruhl, *supra*, at 75. That outcome benefits no one—not the states, not private parties, and certainly not the species that depend on local stewardship and innovative solutions. This perverse result is a recipe for conflict, not cooperation, and threatens the very incentives on which successful species recovery depends. It also creates a constant legal risk for state officials that seek to voluntarily contribute to species recovery, who could be branded ESA violators if they are later deemed to have not gone far enough.

**Conclusion**

The ESA was not meant to conscript states into federal service, but to foster a cooperative approach to conservation that respects the constitutional boundaries of federal and state authority. The ESA's take prohibition should be interpreted in harmony with these principles, not needlessly read to raise serious constitutional questions under the anticommandeering doctrine.

23

For these reasons, this court should reverse the decision below.

Dated: August 4, 2025

Respectfully submitted,

/s/ *Dylan P. Soares*
DYLAN P. SOARES
JONATHAN WOOD
Property and Environment
Research Center (PERC)
2048 Analysis Drive, Suite A
Bozeman, Montana 59718-6829
Telephone: (406) 587-9591
Email: dsoares@perc.org
Attorneys for Amicus Curiae
Property and Environment
Research Center

## Certificate of Compliance with Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

1.  This document complies with the type-volume limit for amicus briefs of Fed. R. App. P. 29(a)(5), excluding the parts of the document exempted by Fed. R. App. P. 32(f) and 11th Cir. R. 32-4:

    [X] this document contains 4,526 words, **or**

    [ ] this brief uses a monospaced typeface and contains __ lines of text.

2.  This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    [X] this document has been prepared in a proportionally spaced typeface using Word 2021 in Century Schoolbook, 14-point font, **or**

    [ ] this document has been prepared in a monospaced typeface using [*state name and version of word-processing program*] with [*state number of characters per inch and name of type*].

Dated: August 4, 2025                    */s/ Dylan P. Soares*
                                         Dylan P. Soares
                                         *Counsel of Record for*
                                         *Amicus Curiae*

## Certificate of Service

I hereby certify that on August 4, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system.

All participants in the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

Dated: August 4, 2025                      */s/ Dylan P. Soares*
                                           Dylan P. Soares
                                           *Counsel of Record for*
                                           *Amicus Curiae*