Nos. 25-11612 & 25-11821

In the United States Court of Appeals
for the Eleventh Circuit

BEAR WARRIORS UNITED, INC.,
*Plaintiff-Appellee,*

v.

SECRETARY, FLORIDA DEPARTMENT OF ENVIRONMENTAL PROTECTION,
*Defendant-Appellant.*

On Appeal from the United States District Court
for the Middle District of Florida
Docket No. 6:22-cv-02048-CEM-LHP

**BRIEF OF *AMICI CURIAE* FLORIDA HOME BUILDERS ASSOCIATION, FLORIDA ONSITE WASTEWATER ASSOCIATION, AND NATIONAL ONSITE WASTEWATER RECYCLING ASSOCIATION SUPPORTING DEFENDANT-APPELLANT AND REVERSAL**

Matthew Z. Leopold                    mleopold@hunton.com
Andrew J. Turner                       aturner@hunton.com
E. Carter Chandler Clements        eclements@hunton.com
Karma B. Brown                        kbbrown@hunton.com
Erica N. Peterson                      epeterson@hunton.com
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Ave., N.W.
Washington, DC 20037
Telephone: (202) 955-1500

*Counsel for* Amici Curiae

## CORPORATE DISCLOSURE/
## CERTIFICATE OF INTERESTED PERSONS

Pursuant to Federal Rules of Appellate Procedure 7.1 and 26.1, 11th Cir. L.R. 26.1-1, 11th Cir. L.R. 26.1-2, and 11th Cir. L.R. 26.1-3, the undersigned counsel of record for *Amici Curiae* Florida Home Builders Association, Florida Onsite Wastewater Association, and National Onsite Wastewater Recycling Association hereby file this Certificate of Interested Persons and Corporate Disclosure Statement.

The Florida Home Builders Association is a not-for-profit, tax-exempt corporation and no publicly held corporation has 10% or greater ownership in the Florida Home Builders Association.

The Florida Onsite Wastewater Association is a not-for-profit, tax-exempt corporation and no publicly held corporation has 10% or greater ownership in Florida Onsite Wastewater Association.

The National Onsite Wastewater Recycling Association is a not-for-profit, tax-exempt corporation and no publicly held corporation has 10% or greater ownership in the National Onsite Wastewater Recycling Association

*Amici* hereby certify that the following listed persons and entities have an interest in the outcome of this case. These representations are made in order that the Judges of this Court may evaluate possible disqualification or recusal.

i

The following persons may have an interest in the outcome of this particular case:

1.    Bear Warriors United, Inc.—Appellee

2.    Blackner, Lesley G.—Counsel for Appellee Bear Warriors United, Inc.

3.    Blome, Jessica L.—Counsel for Appellee Bear Warriors United, Inc.

4.    Brown, Jeffrey—Counsel for Appellant Secretary Lambert

5.    Brown, Karma B.—Counsel for Proposed *Amici Curiae* in Support of Appellant Florida Home Builders Association, Florida Onsite Wastewater Association, and National Onsite Wastewater Recycling Association

6.    Clements, Elizabeth Carter Chandler—Counsel for Proposed *Amici Curiae* in Support of Appellant Florida Home Builders Association, Florida Onsite Wastewater Association, and National Onsite Wastewater Recycling Association

7.    Corbani, Kelley F.—Counsel for Appellant Secretary Lambert

8.    Consovoy McCarthy PLLC—Counsel for Appellant Secretary Lambert

9.    Florida Home Builders Association—Proposed *Amicus Curiae* in Support of Appellant

10.   Florida Onsite Wastewater Association—Proposed *Amicus Curiae* in Support of Appellant

11.   Greenfire Law, PC—Counsel for Appellee Bear Warriors United, Inc.

12.   Harris, Jeffrey M.—Counsel for Appellant Secretary Lambert

13.   Hunton Andrews Kurth, LLP—Counsel for Proposed *Amici Curiae* in Support of Appellant Florida Home Builders Association, Florida

Onsite Wastewater Association, and National Onsite Wastewater Recycling Association

14.  Lambert, Alexis, in her official capacity as Secretary of the Florida Department of Environmental Protection—Appellant

15.  Leopold, Matthew Z.—Counsel for Proposed *Amici Curiae* in Support of Appellant Florida Home Builders Association, Florida Onsite Wastewater Association, and National Onsite Wastewater Recycling Association

16.  Mendoza, Honorable Carlos E.—Judge for the United States District Court for the Middle District of Florida

17.  National Onsite Wastewater Recycling Association—Proposed *Amicus Curiae* in Support of Appellant

18.  Peterson, Erica N.—Counsel for Proposed *Amici Curiae* in Support of Appellant Florida Home Builders Association, Florida Onsite Wastewater Association, and National Onsite Wastewater Recycling Association

19.  Price, Honorable Leslie H.—Magistrate Judge for the United States District Court for the Middle District of Florida

20.  Turner, Andrew J.—Counsel for Proposed *Amici Curiae* in Support of Appellant Florida Home Builders Association, Florida Onsite Wastewater Association, and National Onsite Wastewater Recycling Association

21.  Venable, Nicholas B.—Counsel for Appellant Secretary Lambert

22.  Weir, Bryan—Counsel for Appellant Secretary Lambert

## <u>TABLE OF CONTENTS</u>

CORPORATE DISCLOSURE/ CERTIFICATE OF INTERESTED PERSONS .....i

TABLE OF CITATIONS ........................................................................vi

INTEREST OF *AMICI CURIAE* ............................................................1

STATEMENT OF ISSUES ......................................................................2

INTRODUCTION AND SUMMARY OF THE ARGUMENT ..............................2

ARGUMENT .......................................................................................7

I.      The district court misapplied two fundamental elements of ESA

        take liability: actual take and proximate cause................................7

        A.      The district court misapplied the ESA's definition of "take." ..............9

        B.      The district court erred in concluding the alleged take of

                manatees was proximately caused by FDEP......................................14

II.     The district court erred enjoining the FDEP based on a "risk" of

        rather than actual ongoing or imminent take.................................23

III.    The decision below has significant implications for home

        construction and the economy, and undermines FDEP's

        regulatory program. ......................................................................24

        A.      The district court's overbroad theory of take harms home

                builders and numerous other industries who rely on state and

                local permits. ......................................................................24

B.    The BMAP is the better approach to addressing NIRL

pollution because it is based on current research, not

outdated information. ...........................................................25

CONCLUSION ...................................................................................26

CERTIFICATE OF COMPLIANCE....................................................28

CERTIFICATE OF SERVICE .............................................................28

## <u>TABLE OF CITATIONS</u>

**Cases**                                                        **Page(s)**

*Alliance for the Wild Rockies v. U.S. Dep't of Agric.*,

    772 F.3d 592 (9th Cir. 2014) ...............................................................12

*Am. Bald Eagle v. Bhatti*,

    9 F.3d 163 (1st Cir. 1993).........................................................9, 10, 11

*Animal Welfare Inst. v. Martin*,

    623 F.3d 19 (1st Cir. 2010)....................................................................21

\* *Aransas Project v. Shaw*,

    775 F.3d 641 (5th Cir. 2014) ................................... 10, 14, 15, 17, 19, 20, 21, 23

*Ariz. Cattle Growers v. USFWB*,

    273 F.3d 1229 (9th Cir. 2001) ..............................................................11

\* *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*,

    515 U.S. 687 (1995).........................................................9, 12, 14, 16

*Babbitt v. United Farm Workers Nat'l Union*,

    442 U.S. 289 (1979)................................................................................23

*BBX Cap. v. FDIC*,

    956 F.3d 1304 (11th Cir. 2020) ...........................................................22

*Cal. River Watch v. Cnty. of Sonoma*,

    55 F. Supp. 3d 1204 (N.D. Cal. 2014)..................................................10

*Cal. River Watch v. Pac. Gas & Elec. Co.*,

    No. 3:17-cv-05874, 2018 WL 1000353 (N.D. Cal. Feb. 21, 2018) ..................12

*Cascadia Wildlands v. Kitzhaber*,

    911 F. Supp. 2d 1075 (D. Or. 2012) ....................................................................14

*Defenders of Wildlife v. Adm'r, EPA*,

    882 F.2d 1294 (8th Cir. 1989) ...........................................................................21

*Dep't of Transp. v. Pub. Citizen*,

    541 U.S. 752 (2004)............................................................................................22

*Fla. Panthers v. Collier Cnty.*,

    No. 2:13-cv-612, 2016 WL 1394328 (M.D. Fla. Apr. 8, 2016)........................15

*Loggerhead Turtle v. Cnty. Council of Volusia Cnty., Fla.*,

    148 F.3d 1231 (11th Cir. 1998) .........................................................................21

*Maine Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*,

    70 F.4th 582 (D.C. Cir. 2023)....................................................................11, 19

*Man Against* Xtinction *v. COSCO Container Lines Amerika, Inc.*, No.

    22-cv-10722, 2023 WL 3457905 (D. Mass. May 15, 2023) .............................13

*Paroline v. United States*,

    572 U.S. 434 (2014)............................................................................................15

*Red Wolf Coal. v. N.C. Wildlife Res. Comm'n*,

    No. 2:13–CV–60–BO, 2014 WL 1922234 (E.D.N.C. May 13, 2014)...............10

*Save the Manatee Club v. EPA*,

    No. 6:22-cv-868 (M.D. Fla. Sept. 23, 2024) ........................................5

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*,

    145 S. Ct. 1497 (2025).........................................................................22

*Sierra Club v. Yeutter*,

    926 F.2d 429 (5th Cir. 1991) ...............................................................21

*Strahan v. Coxe*,

    127 F.3d 155 (1st Cir. 1997)................................................................21

*Strahan v. Holmes*,

    595 F. Supp. 2d 161 (D. Mass. 2009)..................................................12

*Strahan v. Mass. Port Auth.*,

    No. 22-1261, 2023 WL 10947175 (1st Cir. Dec. 11, 2023)..............14

*Strahan v. Roughead*,

    910 F. Supp. 2d 358 (D. Mass. 2012)..................................................10

*Wilderness Soc'y v. Thomas*,

    188 F.3d 1130 (9th Cir. 1999) .............................................................10

*Winter v. Nat. Res. Def. Council, Inc.*,

    555 U.S. 7 (2008).................................................................................23

**Statutes**

6 U.S.C. § 1540 ...........................................................................................8

16 U.S.C. § 1532(19) ...........................................................................9, 14

16 U.S.C. § 1533(d) .................................................................................9

16 U.S.C. § 1538 .........................................................................8, 9, 13, 14

16 U.S.C. § 1540(g) ............................................................................7, 8

33 U.S.C. § 1313(c) .................................................................................5

33 U.S.C. § 1313(d) .................................................................................5

**Other Authorities**

50 C.F.R. § 17.3 ...............................................................................9, 12

50 C.F.R. § 17.21(c) ................................................................................9

50 C.F.R. § 17.31(a) ................................................................................9

46 Fed. Reg. 54,750 (Nov. 4, 1981).......................................................12

90 Fed. Reg. 3,131, 3,143 (Jan 14, 2025) .............................................19

90 Fed. Reg. 16102 (Apr. 16, 2025) .......................................................9

BLACK'S LAW DICTIONARY (11th ed. 2019)....................................15

*M. Bean & M. Rowland, The Evolution of National Wildlife Law* (3d ed. 1997) .....9

## INTEREST OF *AMICI CURIAE*

The Florida Home Builders Association (FHBA) is a Florida not-for-profit corporation of over 8,000 members throughout Florida. FHBA is affiliated with the National Association of Home Builders (NAHB) and has 23 local and regional affiliated home builders associations throughout Florida. FHBA aims to serve, advance and protect the welfare of the home building industry in such a manner that adequate housing will be made available by private enterprise to all Americans. FHBA's core mission is to create a climate in which the construction industry can prosper. FHBA's legacy spans over 75 years.

The Florida Onsite Wastewater Association (FOWA) is a Florida non-profit organization comprised of those engaged in the manufacturing, installation, repair, or maintenance of onsite sewage treatment and disposal systems. FOWA's primary objective is education. FOWA provides knowledge about wastewater technologies and maintenance standards to ensure a safe and beautiful Florida for future generations.

The National Onsite Wastewater Recycling Association (NOWRA) is a national non-profit organization comprised of about 6,000 members in the onsite and decentralized wastewater industry. NOWRA exists to educate and serve its members and the public by promoting sound federal, state, and local policies, to improve

1

standards of practice, and to increase public recognition of the need for and benefit of onsite and decentralized wastewater infrastructure.[1]

## STATEMENT OF ISSUES

The issue presented for appeal addressed by *Amici* is whether the Florida Department of Environmental Protection (FDEP) is "in violation" of the ESA.

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

The district court applied a legally flawed notion of "take" and an impermissibly loose theory of "proximate cause" to hold FDEP *in violation* of the Endangered Species Act (ESA). Unless reversed, the holding poses sweeping implications for public and private projects across the county. Correcting the district court's errors is important to numerous industries, government agencies, and individuals.

Representing a significant portion of the home building and wastewater treatment industries in Florida, *Amici* and their members are affected by the district court's decision, which threatens to halt significant economic activity in the Indian River Lagoon (IRL) watershed. Moreover, the district court's flawed interpretation of the ESA to impose take liability based on remote conditions outside the control

---

[1] No counsel for any party authored this brief in whole or in part and no entity or person, aside from *amici curiae*, their members, or their counsel, made any monetary contribution intended to fund the preparation or submission of this brief. *Amici* have filed a motion for leave to file this brief.

of targeted businesses and agencies would have reverberating impacts on the regulatory environment in which *Amici* members operate.

FDEP regulates wastewater discharges throughout Florida. On July 1, 2021, FDEP assumed regulation of Florida's 2.6 million septic systems from the Florida Department of Health. https://tinyurl.com/2j6dhph2. FDEP has instituted a range of measures to limit the release of pollutants (including nutrients) from septic systems to protect environmental resources. *Id*. FDEP does not, however, control all natural and human influences that historically or currently impact the North IRL (NIRL) or manatees. Yet the district court held FDEP liable for unlawful "take" of manatees on an attenuated theory of causation that: septic systems (which FDEP began regulating four years ago) have contributed to water pollution in the approximately 100-square-mile NIRL; water pollution in the NIRL has contributed to conditions that led to the depletion of seagrass; the depletion of seagrass on which manatees feed has harmed manatees within the NIRL; and there is a risk such "harm" will reoccur in the future. To remedy the purported violation, the district court ordered FDEP to take various actions to restore seagrass to the lagoon, obtain a permit authorizing take of manatees, and cease permitting septic systems in the region in the meantime.

The district court's order is contrary to fundamental principles governing ESA take liability. Specifically, the district court erred in finding a "take" violation by

3

failing to (1) find an actual take of a manatee and (2) apply the proximate cause standard that governs ESA take cases. The district court's theory of take liability is so broad that virtually any entity could face severe legal risks based on general assumptions about an activity's indirect impacts on distant listed species. *Amici* depend on FDEP's implementation of a predictable water quality program within the scope of its statutory authority. Their members have firsthand experience with advocacy campaigns that seek to block projects based on remote circumstances outside their members' control. This experience teaches that, unless the district court's error is reversed, advocacy groups will be emboldened to bring similar actions against countless other activities on equally tenuous theories the ESA take prohibition does not (and was never intended to) address. This unlawful intervention into FDEP programs must be corrected, and the district court's decision reversed.

**Regulatory Background**

The basin comprising the IRL is located between Interstate 95 and the Atlantic coastline. In 1987, the IRL was designated a priority waterbody in need of restoration and protection due to historic loss of marsh and wetlands, excessive discharges from drainage and floodwater systems, and wastewater and stormwater discharges—the combination of which exacerbated turbidity and promoted algae growth, which contributed to seagrass reductions. *See* https://tinyurl.com/y8cyx5zp.

The State of Florida, and FDEP in particular, have worked diligently to restore and protect the IRL through a range of programs under federal and state law. Pursuant to the Clean Water Act (CWA), FDEP established water quality standards approved by EPA that apply throughout Florida, including the IRL. 33 U.S.C. § 1313(c). In 2012, FDEP established total maximum daily loads (TMDLs) specific to the IRL, with EPA approval, representing the maximum amount of specific pollutants the waterbody can assimilate under governing water quality standards. *Id.* § 1313(d)(1)(A),(C); Fla. Admin. Code Ann. R. 62-302.531 (2012). The IRL TMDLs set numeric nutrient criteria based, in part, on water quality conditions necessary for seagrass recovery including target dates for achieving those conditions. Fla. Admin. Code Ann. R. 62-302.531 (2012).

When EPA approved the TMDLs, it considered potential effects on listed species (including the manatee) under ESA section 7 consultation requirements. *Save the Manatee Club v. EPA*, No. 6:22-cv-868 (M.D. Fla. Sept. 23, 2024) (ECF No. 61 at 4). EPA determined its approval of the TMDLs had "no effect" or was "not likely to adversely affect" listed species or designated critical habitat, and the U.S. Fish and Wildlife Service (USFWS) (which has primary federal regulatory and enforcement authority as to manatees) concurred. *See id.*

FDEP also adopted a Basin Management Action Plan (BMAP) for the NIRL. *Fla. Dep't of Envt'l Protection*, NIRL BMAP 2025, *https://tinyurl.com/5asck87b*.

The BMAP sets a framework for water quality restoration that incorporates local and state commitments to reduce pollutant loading through current and future projects and strategies. The BMAP includes a wide range of measures such as best management practices for agricultural and urban activities, permit limits, and conservation plans, all designed to achieve pollution reductions required by the TMDL. *See id.* at 22. The BMAP specifically addresses nitrogen released by agricultural practices, stormwater, and sewage treatment plants and septic systems, sets target dates to achieve reductions, and is legally enforceable. *See id.* Achievement of BMAP targets remains on track as of July 2025. R.188 at 62.[2] FDEP updates the BMAP every five years. R. 92 at 9.

FDEP also implements the CWA National Pollutant Discharge Elimination System permit program in Florida. *Id.* at 12. Specifically, FDEP imposes enforceable permit conditions governing individual discharges into the NIRL to ensure compliance with the TMDL, BMAP, and other applicable water quality standards. *See id.* That permitting process has led to the improved treatment of discharges from wastewater facilities that contribute nutrients to the NIRL.

FDEP's efforts, along with other state and federal partners, have produced positive results for the manatee. In 2021, the Working Group on Marine Mammal

---

[2] Citations to the district court docket are in the format R.X at Y. Citations to this Court's docket are in the format Doc.X at Y.

Unusual Mortality Events declared an "unusual mortality event" (UME) based on increased manatee mortalities along the Atlantic coast, including manatees that appeared emaciated. https://tinyurl.com/2hmf63jz. The USFWS and Florida Wildlife Conservation Commission (FWC) developed and implemented response strategies, including aquatic habitat restoration. *Id.* They conducted focused aerial surveys and GPS tagging to monitor individual manatees and population levels. *Id.* They also implemented supplemental feeding and supported expansion of manatee rehabilitation centers. *Id.* Manatee mortalities decreased after April 2022, and are now at "levels that are expected when there are no unusual causes of death or events, and manatees appear to be in better physical condition.… This improvement is attributed to the fact that seagrass is slowly recovering in some key areas…." https://tinyurl.com/w34evje8. In fact, "**researchers have not documented a manatee death from starvation linked to a lack of forage for two years**," so the manatee UME was closed in March 2025 with an official end date of April 30, 2022. *Id* (emphasis added); *see* https://tinyurl.com/mvzus8d6.

## ARGUMENT

### I.     The district court misapplied two fundamental elements of ESA take liability: actual take and proximate cause.

The district court granted injunctive relief under the ESA's citizen suit provision, which allows the court "to enjoin any person" who is "in violation of any provision" of the ESA. 16 U.S.C. § 1540(g)(1)(A). Specifically, the district court

7

found FDEP "in violation" of ESA Section 9, which makes it unlawful for "any person" to "take" an endangered species. 16 U.S.C. § 1538. A Section 9 violation has two elements: (1) an actual "take" of a listed species (2) caused by the defendant. *Id.* Both elements must be met for a defendant to be "in violation" of the take prohibition, and thus subject to an ESA citizen suit injunction (or ESA enforcement action). 16 U.S.C. § 1540(g)(1)(A).

A precise application of the take standard is crucial because a violation of the ESA "take" prohibition carries significant consequences. When the government brings a case, each instance of take is subject to up to $63,991 in civil penalties and a court order enjoining the violation and/or up to $100,000 in criminal fines and not more than one year in prison (or both). 16 U.S.C. § 1540(a), (b), (e) and (g); 50 C.F.R. § 11.33(c). In an ESA "citizen suit" (such as this), the available remedy against a person found "in violation of" the take prohibition is a court order enjoining the violation and requiring payment of the plaintiff's costs, including attorney and expert fees. *Id.* § 1540(g)(1)(A), (g)(4).

Naturally, courts require evidentiary proof the defendant violated—or in an ESA citizen suit is "in violation of"—the take prohibition before imposing an injunction or other penalties. *Id.* Indeed, given the potentially dire consequences, it

is critical that a take violation not rest on assumptions or conjecture—particularly in a case like this that involves an indirect, multilink chain-of-causation.[3]

A.       The district court misapplied the ESA's definition of "take."

An ESA take violation requires evidence of actual death, injury, harm or harassment to an endangered species by a person. The USFWS has, by regulation, extended the ESA section 9 take prohibition to certain species listed as "threatened," including the manatee. 16 U.S.C. §§ 1533(d), 1538; 50 C.F.R. §§ 17.21(c), 17.31(a). The ESA defines "take" as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt to engage in such conduct." 16 U.S.C. § 1532(19).

USFWS regulations specify that harm is "an act which *actually* kills or injures wildlife." 50 C.F.R. § 17.3 (2006) (emphasis added).[4] This means the harm prohibition cannot be enforced "until an animal has actually been killed or injured." *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 703 (1995).[5] It is not sufficient to merely show a "numerical probability of harm." *Am. Bald Eagle v. Bhatti*, 9 F.3d 163, 165–66 (1st Cir. 1993). Instead, the "proper standard for

---

[3] The ESA take prohibition is "perhaps the most powerful regulatory provision in all of environmental law." *See M. Bean & M. Rowland, The Evolution of National Wildlife Law*, at 213 (3d ed. 1997).

[4] The USFWS issued a proposed rule in April 2025 to rescind the regulatory definition of harm, and implement the term based on the plain text of the ESA. 90 Fed. Reg. 16102 (Apr. 16, 2025).

[5] The ESA also prohibits harassment of listed species, a form of take not implicated by the district court's findings. *See infra* note 7.

establishing a taking under the ESA" is "a showing of 'actual harm'" to the listed species. *Id.*

A take analysis starts with evidence of a potential take: in this case, evidence of the actual death of or injury to a manatee. For example, in *Aransas Project v. Shaw*, 775 F.3d 641 (5th Cir. 2014), the Fifth Circuit considered evidence specific to the deaths of twenty-three whooping cranes based on an expert report and testimony, particularly direct evidence of four deaths. *Id.* at 654 & n.8. Other courts likewise consider evidence of specific deaths or injuries. *See Strahan v. Roughead*, 910 F. Supp. 2d 358, 368 (D. Mass. 2012) (specific instances of Navy ships striking right whales); *Red Wolf Coal. v. N.C. Wildlife Res. Comm'n*, No. 2:13–CV–60–BO, 2014 WL 1922234, at *3 (E.D.N.C. May 13, 2014) (deaths of nine specific red wolves). Indeed, the Northern District of California dismissed a take case where the plaintiff failed to identify a "concrete instance of a 'take'" because "harm is best assessed when it is tangible [not] theoretical." *Cal. River Watch v. Cnty. of Sonoma*, 55 F. Supp. 3d 1204, 1210 (N.D. Cal. 2014) (citing *Wilderness Soc'y v. Thomas*, 188 F.3d 1130, 1133–34 (9th Cir. 1999)).

Here, the district court did not focus on evidence of the death or injury of *any* specific manatee, and instead made only general findings that wastewater pollutants entered the NIRL, led to the death of seagrasses, and the death of seagrasses has previously led to the death of manatees. The district court made general observations

that "lack of seagrasses has caused manatee takings in the past," R. 172 at 9 (citing R. 134 at 16), and that "effects of legacy pollutants, particularly causing the absence of seagrasses, have a sufficiently serious impact on manatees," *id.* at 13. But those general conclusions are far from specific findings on the death or injury of one or more manatees (e.g., evidence of the factors that contributed to the death of a manatee such as malnutrition, disease, or injury). *See Am. Bald Eagle*, 9 F.3d at 165–66 ("numerical probability of harm" is not sufficient); *Ariz. Cattle Growers v. USFWB*, 273 F.3d 1229, 1243–46 (9th Cir. 2001) (speculation about "possible" or "likely" death or injury not enough).[6] Similarly insufficient is the district court's observation that "almost no live calves [were] found from 2020 to 2022" and that "[w]hile there was return of manatees observed with calves in 2023 and 2024, 2024 was also marked by a spike in manatee calf mortality." R.172 at 14. Lack of manatee observations and a general reference to a "spike" in mortality numbers do not provide the evidence necessary for an analysis of the circumstances of a death or injury, much less whether the defendant was the legal cause.

---

[6] When federal agencies consult with the Services under ESA section 7, 16 U.S.C. § 1536(a)(2), they must "use the best scientific and commercial data available," *id.*, an "empirical mandate [that] "ensures the law is not 'implemented haphazardly, on the basis of speculation or surmise.'" *Maine Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 70 F.4th 582, 595, 599 (D.C. Cir. 2023) Given the severe implications of take liability, it is at least equally important that a take violation not rest on speculation, surmise, or pessimistic assumptions.

The court focused on loss of seagrass, but loss of seagrass is not, in and of itself, a take. Take must be of a listed species. Habitat modification or degradation cannot constitute take unless it "result[s] in actual injury" to a listed species, 46 Fed. Reg. at 54,750 (Nov. 4, 1981); *Sweet Home*, 515 U.S. at 696–700 ("habitat modification" is subservient to the phrase 'an act which actually kills or injures wildlife'").[7] For habitat modification to constitute a take, there must be evidence it resulted in an actual death or injury of at least one member of a listed species. Evidence of decreasing numbers of a species and general findings of habitat modification are insufficient. *C.f. Cal. River Watch v. Pac. Gas & Elec. Co.*, No. 3:17-cv-05874, 2018 WL 1000353, at *3 (N.D. Cal. Feb. 21, 2018) (allegation "fish species at issue are in decline" and "that PG&E has in some unspecified way . . . modified the species' habitat" are insufficient to plead a "take" claim).

---

[7] The ESA also prohibits "harassment" of endangered species, which ESA regulations define as "an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering." 50 C.F.R. § 17.3 (2006). This case does not involve evidence or findings that one or more manatees were "annoyed", much less to an extent that would rise to the level of take. *See, e.g., Alliance for the Wild Rockies v. U.S. Dep't of Agric.*, 772 F.3d 592 (9th Cir. 2014) (helicopter hazing of bison did not take grizzly bears through harassment); *Strahan v. Holmes*, 595 F. Supp. 2d 161 (D. Mass. 2009) (fisherman whose gear entangled humpback whale did not "harass" whale). The district court did not find that one or more manatees were "annoyed", that such annoyance significantly disrupted normal behavioral patterns, and the annoyance resulted from a specific act or omission by FDEP.

The district court referenced one specific manatee death, but only in passing
—noting expert witness testimony that "the last necropsy that showed manatee
emaciation occurred two years ago." R. 172 at 19. But the death or injury of a listed
species is not in and of itself a take. Neither a single injured manatee nor a mortality
event involving multiple manatees is a take absent proof a person was the legal cause
of the death or injury. That is, a finding of take must be based on evidence of the
death or injury of one or more specific listed species (such as manatees) caused by
a "person." 16 U.S.C. § 1538(a)(1)(B). But the district court did not make evidence-
based findings as to any particular manatee's death or injury, such as the cause of
emaciation (lack of food, disease, or something else) or whether there was a
connection between the death of a manatee and the conduct of any person, let alone
FDEP in particular. *See Man Against* Xtinction *v. COSCO Container Lines Amerika,
Inc.*, No. 22-cv-10722, 2023 WL 3457905, at * 4 (D. Mass. May 15, 2023)
(dismissing claims because plaintiff "alleged no particular facts of an actual or
imminent taking of a whale caused by any particular vessel owned or operated by
defendant"). In any event, the death of a manatee "two years ago" is not proof that
FDEP or any other entity is *currently* "in violation" of the ESA. Finding FDEP "in
violation" of the take prohibition is impossible to square with the expert agencies'
decision to close the manatee UME based on *no* documented manatee mortality
related to food stress *in over two years*.

The district court's misapplication of the actual death or injury requirement, and its failure to analyze any actual manatee death or injury, set the stage for its equally flawed proximate cause analysis. Without facts of a specific manatee death or injury, there was no starting point to determine causation. As a result, the district court did not evaluate whether any particular death or injury of a manatee was proximately caused by FDEP or by one or more other causes.

**B.      The district court erred in concluding the alleged take of manatees was proximately caused by FDEP.**

Not every death of or injury to a listed species is a "take." Rather, a "take" is "conduct" by "a person" "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. §§ 1532(19), 1538(a)(1)(B). Proof that the defendant's "conduct" was the proximate cause of a death or injury is an essential element of a "take."

It is well established that proximate cause is required to affix liability for an ESA take violation. *Sweet Home*, 515 U.S. at 690–708; *Aransas*, 775 F.3d at 656; *Cascadia Wildlands v. Kitzhaber*, 911 F. Supp. 2d 1075, 1084 (D. Or. 2012) ("It is well accepted that proximate cause is an element of ESA Section 9 claims."). The Supreme Court has recognized that the ESA incorporates "ordinary requirements of proximate causation." *Sweet Home*, 515 U.S. at 700 n.13; *see also Strahan v. Mass. Port Auth.,* No. 22-1261, 2023 WL 10947175 (1st Cir. Dec. 11, 2023) (explaining

that common-law principles of proximate causation govern the determination of liability under the ESA.).

Ordinary principles of proximate causation require finding the alleged conduct of the defendant "was not just any cause, but one with a sufficient connection to the result." *Paroline v. United States*, 572 U.S. 434, 444 (2014). In other words, a proximate cause is "[a] cause that directly produces an event and without which the event would not have occurred." Proximate Cause, BLACK'S LAW DICTIONARY (11th ed. 2019). "Applying a proximate cause limit to the ESA must . . . mean that liability may be based neither on the 'butterfly effect' nor on remote actors in a vast and complex ecosystem." *Aransas*, 775 F.3d at 657–58. "[T]here must be a close connection between the liable actor's conduct and habitat destruction or killing of endangered species." *Fla. Panthers v. Collier Cnty.*, No. 2:13-cv-612, 2016 WL 1394328, at *22 (M.D. Fla. Apr. 8, 2016). In assessing proximate cause, courts must consider the "remoteness, attenuation, [and] the natural and probable consequences of" the defendant's actions. *Aransas*, 775 F.3d at 658–59.

The district court misapplied the proximate cause requirement. Specifically, it relied on a far more tenuous chain of causation than the law allows. The district court's theory of causation is that FDEP issues permits for septic systems built by third parties that may release chemicals to groundwater, which then travel

underground to the lagoon, which may then (along with other pollution) contribute to the growth of algae, which may shade seagrasses, which could limit the growth of the seagrasses, which can limit a food source for manatees, which could lead to food stress for manatees that may result in injury to or death of a manatee. In support of this lengthy chain of causation, the district court pointed to an example of proximate cause provided in Justice O'Connor's *Sweet Home* concurrence: a farmer who drained a pond that contained an endangered fish resulting in death of the fish. R. 172 at 18; R. 134 at 15. In that example, the farmer directly caused and controlled the removal of water that killed the fish and, with no intervening actors or causes, the death would not have occurred without the famer's action. FDEP's regulation of septic systems is far more removed from the death of one or more manatees, and there are a multitude of other actors and causes that must be considered. More apt is Justice O'Connor's example of *lack* of proximate cause to support take liability: where a "farmer who tills his field and causes erosion that makes silt run into a nearby river which depletes oxygen and thereby [injures] protected fish." *Sweet Home*, 515 U.S. at 713 (O'Connor, J., concurring). FDEP's activities here are even more remote from any death or injury to a manatee than the farmer in that example, whose tilling indirectly affects endangered fish.

Each link in the district court's chain of causation becomes increasingly weak as it moves away from FDEP's regulation of septic systems. First, FDEP has only

limited control over the actions of septic tank owners. FDEP has authority to issue, revoke, or deny septic system permits, but it does not have control over all actions of septic tank owners. Second, FDEP assumed permitting authority in July 2021, and so has no control over the "legacy pollutants" the district court found were responsible for loss of seagrass. R. 172 at 12–13. Third, the district court did not address the extent to which releases from septic systems combine with *other* pollutants from *other* sources, or from septic system releases before FDEP assumed regulatory authority in 2021. Fourth, the district court did not address the extent to which general pollution of the NIRL combines with *other* human and natural causes, such as sedimentation or weather events and conditions. Fifth, the district court never assessed the extent to which the condition of seagrasses can be attributed to FDEP in light of these numerous other factors. Finally, and most critically, the district court made no findings whether a *particular* manatee death or injury could be traced to seagrass conditions and from there to third-party activities controlled by FDEP.

Such an attenuated chain of causation is similar to the one the Fifth Circuit found insufficient to establish take liability in *Aransas*. There, the Fifth Circuit held the district court erred in finding the Texas Commission on Environmental Quality liable for failure to properly manage freshwater flows into a bay, allegedly causing unlawful take of endangered whooping cranes. 775 F.3d at 656. The Fifth Circuit noted that the district court never explained "why the remote connection between

water licensing, decisions to draw river water by hundreds of users, whooping crane habitat, and crane deaths that occurred during a year of extraordinary drought compels ESA liability." *Id.* at 658–59. The Fifth Circuit observed that the district court based take liability on "remote actors in a vast and complex ecosystem," *id.* at 657–68, and that the district court's proximate cause analysis could lead to the conclusion that "issuing drivers' licenses will 'cause the take' of endangered species run over by cars" or that "governmental licensing of power lines, wind turbines or cell towers, with which many endangered birds collide, could violate the ESA." *Id.* at 659.

The chain of causation is equally attenuated here. The district court failed to explain how FDEP can be held liable for take despite the remote connection between its recent permitting actions, actions of septic system users, various historic and recent factors contributing to the condition of manatee habitat, and manatee deaths. The district court did not address numerous other sources of impacts on seagrass such as: historic pollution; runoff; other forms of pollution beyond FDEP's control; temperature changes, sedimentation; storms; and other variables "in a vast and complex ecosystem," *id.* at 658.[8] Instead, each link in the district court's chain of

---

[8] Plaintiff's complaint correctly acknowledges that extreme weather events, such as hurricanes, can contribute to impacts on food available for manatees. R. 59-6 at 96.

causation relies on conjecture and speculation. *See Maine Lobstermen's Ass'n*, 70 F.4th at 595 (ESA not to be applied on basis of speculation, surmise or conjecture).

Indeed, USFWS, the expert ESA agency, determined in January 2025 that "many factors affect[] the viability of manatees" including but not limited to seagrass declines, "seagrass resources have declined along the Atlantic coast since 2011" (ten years before FDEP began regulating septic tanks near the IRL), many efforts are being taken by the State of Florida and numerous other parties "to improve the IRL's health … aimed at removing legacy nutrient loads and reducing current nutrient sources through the implementation of stormwater improvement projects, fertilizer bans, septic to sewer conversions, dredging of accumulated muck from the lagoon, and restoration projects for oysters, clams, and seagrass," and "there has been some recently reported improvement in the condition of seagrass beds in the IRL." 90 Fed. Reg. 3,131, 3,143 (Jan 14, 2025).

Further, the district court, like the district court in *Aransas*, did not find facts proving FDEP could *reasonably* have foreseen or anticipated each link in the chain of causation, nor could the district court have done so on the record before it. In *Aransas*, the Fifth Circuit noted that the only time the district court addressed foreseeability was with respect to "the effect of water-permitting on freshwater inflows." 775 F.3d at 660–61. The district court distinguished *Aransas* on the grounds that *Aransas* involved "extraordinary conditions," while eutrophication

from onsite septic systems and wastewater treatment plant discharges "can be predicted as a function of population growth and is a function of population growth and is not solely caused by natural weather events." R. 134 at 14. But that general observation does not mean FDEP would have reasonably foreseen that its regulation of septic systems would cause manatee mortalities. Furthermore, drought conditions were simply one factor in *Aransas*, not the determining factor as to proximate cause. The district court simply failed to explain how FDEP would have reasonably foreseen that *its* actions were the proximate cause of manatee deaths or injuries, much less how FDEP could have controlled whether those deaths or injuries occurred. Moreover, the district court ignored the key takeaway from *Aransas:* that proximate cause requires a "close connection" between the defendant's conduct and the destruction or killing of endangered species. 775 F.3d. at 659. There is no evidence-based close connection between FDEP's permitting of septic systems and the death of one or more manatees from loss of seagrass.

Even if septic tank operations were shown to cause take (they were not), proximate cause is not established merely based on government authorization of an activity. *Id.* at 658. Finding proximate cause based on an agency "authorizing" an activity that caused take would create "liability far beyond the contours of current ESA case law" approaching "almost per-se proximate cause." *Id.* at 659. Instead, the caselaw holds that regulatory acts result in ESA liability only where an actor directly

exacts a taking pursuant to an agency's authority and "a close connection existed between the liable actor's conduct and habitat destruction or killing of endangered species." *Id.* (citing *e.g. Sierra Club v. Yeutter*, 926 F.2d 429, 432–33 (5th Cir. 1991)); *see also Animal Welfare Inst. v. Martin*, 623 F.3d 19 (1st Cir. 2010) (state agency licensure of animal traps known to catch endangered lynx); *Defenders of Wildlife v. Adm'r, EPA*, 882 F.2d 1294 (8th Cir. 1989). In other words, the government agency must have control over the action that directly causes the take. *Strahan v. Coxe*, 127 F.3d 155 (1st Cir. 1997). For example, in *Strahan* a state agency was found liable for licensing use of fishing gear known to entangle endangered whales at specific times and locations where whales were known to be present, because a state agency "pursuant to whose authority an actor directly exacts a taking of an endangered species may be deemed to have violated . . . the ESA." *Id.* at 163, 165. Liability was appropriate because the agency licensed the use of the gear at the time and place and "in specifically the manner" that caused the take. *Id.* at 164–66. This Court has likewise emphasized the importance of control in determining proximate cause, explaining that proximate cause for purposes of ESA liability is established where "a regulatory entity . . . exerts control over the use of something that allegedly takes protected wildlife." *Loggerhead Turtle v. Cnty. Council of Volusia Cnty., Fla.*, 148 F.3d 1231, 1251 (11th Cir. 1998). But there is

no evidence in this case that FDEP controlled a loss of seagrass that allegedly harmed manatees.

In a related context, the Supreme Court recently emphasized that a government agency cannot be held responsible for effects under the National Environmental Policy Act that it has no ability to prevent. *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 145 S. Ct. 1497, 1516 (2025) ("where an agency has no ability to prevent a certain effect due to its limited statutory authority over the relevant actions, the agency cannot be considered a legally relevant 'cause' of the effect") (citing *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 770 (2004)); *BBX Cap. v. FDIC*, 956 F.3d 1304, 1313 (11th Cir. 2020) (no proximate cause where agency lacks "absolute authority to issue environmental ordinances that would . . . prevent plaintiffs' injuries"). There is no proof in this case that any manatee injury or death could have been prevented "but for" some action by FDEP, and even if there were, the "but for" standard is insufficient to attribute an effect to an agency—even for NEPA review purposes. *Seven Cnty. Infrastructure Coal.*, 145 S. Ct. at 1517 ("a mere 'but for' causal relationship is insufficient to make an agency responsible for a particular effect" (citing *Public Citizen*, 541 U.S. at 767)).

FDEP does not control the mechanism that directly causes the alleged manatee injuries and deaths—starvation resulting from absence of seagrass. FDEP does not control the level of seagrass, nor do its septic system permit actions control the

22

numerous factors relevant to seagrass conditions (including the acts of third parties,

weather events, sedimentation, and other sources of pollution). Even if nutrient

impacts to seagrass alone were sufficient to demonstrate death or injury to manatees

(they are not), FDEP cannot be the proximate cause of the alleged manatee deaths

because, as the district court found, "legacy pollutants" injured manatees "in the

past." R. 172 at 12–13. FDEP has no control over pollution that pre-dated its 2021

acquisition of the permitting program or over weather conditions or events, and so

cannot be a proximate cause of any harm caused by them.

## II.    The district court erred enjoining the FDEP based on a "risk" of rather than actual ongoing or imminent take.

The district court entered an injunction requiring FDEP to apply for an

incidental take permit based on an "ongoing risk" of manatee takes. R. 172 at 20.

But the ESA's citizen suit provision does not allow a court to enjoin *the risk* of a

take, and instead authorizes injunctions to prevent actual ongoing or imminent take.

"A court's power to order injunctive relief in the ESA context "depends, as in all

other cases, on whether plaintiffs have established by a preponderance of the

evidence, that there is 'a reasonably certain threat of imminent harm to a protected

species.'" *Aransas*, 775 F.3d 663–64 (citing *Babbitt v. United Farm Workers Nat'l

Union*, 442 U.S. 289, 298 (1979) and *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S.

7, 2 (2008)). In other words, "[a]n injunction may thus be issued only if future injury

is 'certainly impending.'" *Id.* That is because the ESA's citizen suit provision

balances the equities in favor of granting an injunction to protect listed species, but only if take is actually occurring or is certain to occur imminently (not where there is merely a threat of take or "ongoing risk" of take). *See id.* at 663–64.

The district court improperly granted an injunction based merely on "an ongoing risk of manatee takings." R. 172 at 20. An ongoing "risk" of harm is not sufficient to warrant injunctive relief. For an injunction to issue in the ESA context, the court must find that future take is "certainly impending." The district court made no such finding here, relying instead on speculation that if wastewater discharges continue to occur pursuant to FDEP's regulations, there is a "risk" of future manatee takes. That does not establish an actual ongoing or certainly imminent take.

III.   **The decision below has significant implications for home construction and the economy, and undermines FDEP's regulatory program.**

  A.      **The district court's overbroad theory of take harms home builders and numerous other industries who rely on state and local permits.**

An overbroad application of the take prohibition affects numerous industries, including home builders. The district court's improper application of ESA take standards, if allowed to stand, would impact home builders in at least two ways. Potential take liability for states and municipalities affects home builders when they seek permits from state or local authorities, and can affect home builders when they undertake projects that may be alleged by third parties to result in a take.

Project proponents need certainty about their obligations under the ESA in order to plan their projects, especially in light of the criminal and civil penalties imposed by the EPA. Weakening the actual take and proximate cause requirements introduces significant uncertainty whether a home builder may be subject to liability for harm it did not reasonably foresee based on a loose chain of causation. The result is an increase in costs and time in order for home builders to seek incidental take permits they would not otherwise need. Increased costs will be passed on to consumers in the form of higher rental and retail home prices.

The threat of ESA liability for state and local governments who issue permits for actions alleged to take listed species may slow down the permitting process, resulting in increased burdens and delays for the government and regulated parties. The district court's decision may cause state and local governments to delay permitting decisions or even deny permits for fear some downstream effect beyond their regulatory authority or control will result in ESA liability. Home builders would then be subject to further costs and delays as they try to obtain the necessary permits to complete their projects. This Court should correct the district court's erroneous interpretation of the ESA take provision.

**B.      The BMAP is the better approach to addressing NIRL pollution because it is based on current research, not outdated information.**

The district court's decision failed to take into account FDEP's adoption of the BMAP, a framework for water quality restoration through state and local

25

commitments to reduce pollution. Rather than rely on out-of-date information (as the district court did), the BMAP is based on ongoing research about best management practices. The BMAP specifically addresses nitrogen releases from septic systems, and sets target dates to achieve reductions. The BMAP takes a comprehensive approach to water quality restoration that brings together various stakeholders.

The district court's decision undermines the BMAP framework by requiring FDEP to shift its focus from matters within its expertise—water quality restoration—to matters over which it lacks expertise and authority under state law—creating new manatee feeding, monitoring, and reporting programs. The district court did not take into account the most recent developments when issuing its decision, basing its decision instead on outdated information about manatee deaths and the state of pollution in the NIRL. The better approach to addressing pollution in the NIRL is for FDEP to continue to implement the BMAP, including measures specifically designed to reduce nitrogen releases, based on the latest research and through coordination with all relevant stakeholders.

## **CONCLUSION**

The district court's judgment should be reversed.

26

DATED: Aug. 4, 2025          Respectfully submitted,

/s/ Matthew Z. Leopold
Matthew Z. Leopold
Andrew J. Turner
E. Carter Chandler Clements
Karma B. Brown
Erica N. Peterson
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Ave., N.W.
Washington, DC 20037
Telephone: (202) 955-1500
mleopold@hunton.com
aturner@hunton.com
eclements@hunton.com
kbbrown@hunton.com
epeterson@hunton.com

*Counsel for* Amici Curiae

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because it contains 6,470 words, excluding the parts exempted by Fed. R. App. P. 32(f) and 11th Cir. R. 32-4. I also certify that this brief complies with the requirements of Fed. R. App. P. 32(a)(5)-(6) because it has been prepared in 14-point Times New Roman font, using Microsoft Word.

Dated: August 4, 2025

/s/ Matthew Z. Leopold

## CERTIFICATE OF SERVICE

I hereby certify that on this 4th day of August 2025, a true copy of the foregoing was served on opposing counsel via electronic filing using the appellate CM/ECF system.

/s/ Matthew Z. Leopold